**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| INSIGNIA SYSTEMS, INC., | Civil No. 04-4213 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| NEWS AMERICA MARKETING IN-STORE, INC. and ALBERTSON'S INC., | |
| Defendants. | |

Willie L. Hudgins, **COLLIER SHANNON SCOTT**, 3050 K Street NW, Suite 400, Washington, DC 20007-5108; and Robert L. Meller, Jr., and James C. Diracle, **BEST & FLANAGAN**, 225 South Sixth Street, Suite 4000, Minneapolis, MN 55402-4690, for plaintiff.

Stacey Anne Mahoney and Kerin E. Coughlin, **CONSTANTINE CANNON**, 450 Lexington Avenue, 17th Floor, New York, NY 10017; and Todd A. Wind, **FREDRIKSON & BYRON**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, for defendant News America Marketing In-Store, Inc.

Phillip A. Proger, **JONES DAY**, 51 Louisiana Avenue NW, Washington, DC 20001-2113, and Michael A. Lindsay, **DORSEY & WHITNEY LLP**, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402-1498; for defendant Albertson's Inc.

Plaintiff Insignia, Inc. and defendant News America Marketing In-Store, Inc. ("NAMI") are direct competitors in the in-store advertising market. Each buys shelf space and other advertising space from retailers, like defendant Albertson's Inc. ("Albertsons"), and sells advertising services to manufacturers of packaged products.

Insignia alleges state and federal antitrust violations against NAMI and Albertsons and false advertising violations against NAMI.  In an order dated August 25, 2005, the Court dismissed without prejudice Insignia's complaint, and Insignia filed an amended complaint on September 23, 2005.  NAMI and Albertsons now move to dismiss the amended complaint under Rule 12(b)(6) for failure to state a claim.  In addition, NAMI filed two motions to strike information from the amended complaint and a motion to disqualify plaintiff's counsel.  For the following reasons, the Court denies the motions.

## ANALYSIS

**I. MOTIONS TO STRIKE INFORMATION AND MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL**

### A. Motion To Strike Based On The Protective Order

Litigation between NAMI and Insignia is also pending before the United States District Court for the Southern District of New York.  NAMI argues that allegations in and attachments to Insignia's amended complaint in the action before this Court violate a protective order from the New York litigation, and that the Court should strike it pursuant to Federal Rule of Civil Procedure 12(f).[1]  Under Rule 12(f), the Court may strike from any pleading "any redundant, immaterial, impertinent, or scandalous matter."

---

[1] Specifically, NAMI urges the Court to strike: 1) Exhibit B in its entirety; 2) ¶¶ 31-34 of the amended complaint, which are based on Exhibit B; 3) Exhibit E in its entirety; and 4) the first five sentences of ¶ 44 of the amended complaint, which are based on Exhibit E.  Exhibits B and E are internal memoranda by grocery stores to their division managers, which Insignia uses to support its allegations that those stores are coordinating with NAMI to boycott Insignia.  It is undisputed that NAMI produced these documents during discovery in the New York litigation.

(Footnote continued on next page.)

The protective order states in paragraph 1, "All information . . . disclosed . . . in response to any discovery method . . . shall be used only for the purpose of this litigation and not for any other purpose." NAMI argues that the plain language of the protective order bars use of *any* information in other litigation. Insignia argues that the protective order protects only those documents designated as *confidential*, and that the documents at issue here are not designated confidential.

The Court concludes that the contested language in paragraph 1 must be interpreted in the context of the entire protective order, which focuses on confidentiality issues. *See Go-Video v. Motion Picture Ass'n of Am. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 10 F.3d 693, 695 (9th Cir. 1993) ("For the protective order to comply with common sense, a reasonable reading must connect its prohibitions to its purpose – protection against disclosure of commercial secrets."). Because the protective order is aimed at protecting confidential documents, the Court concludes that it does not cover the non-confidential documents at issue here. Accordingly, the Court denies this motion.

_____
(Footnote continued.)

As an initial matter, Insignia argues that NAMI's motions to strike are untimely because NAMI filed the motions 96 days after filing its motion to dismiss. *See* Fed. R. Civ. P. 12(g) (providing that all motions under Rule 12 must be made together to prevent waiver, unless the motion falls within one of the enumerated exceptions of Rule 12(h)(2)). The Court concludes that NAMI preserved the motions by noting its intention to file them in its motion to dismiss.

B.   **Motion To Strike Based On The Settlement Agreement**

NAMI also argues that allegations in and an exhibit attached to the amended complaint violate a settlement agreement entered into by NAMI and Insignia.[2] Insignia argues that the contested allegations and exhibit are highly relevant because they place in proper context NAMI's conduct that occurred after the settlement agreement.

The settlement agreement released NAMI from anti-trust liability for any conduct that pre-dated November 14, 2002. Specifically, the settlement agreement expressly released NAMI from "any and all claims that [were] the subject" of the 2000 litigation "that arise out of the events and actions complained of" in that litigation, "or that relate in any way . . . to the claims asserted in or the underlying facts of that litigation."

A motion to strike should not be used to strike allegations that supply background or historical material unless unduly prejudicial to defendant. *See Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 402 F. Supp. 636, 638 (S.D.N.Y. 1975). The Court concludes that the contested allegations and exhibit provide important background for the claims in this action, and that NAMI has not shown prejudice. Accordingly, the Court denies this motion.

---

[2] Specifically, NAMI urges the Court to strike: 1) ¶ 18 in its entirety; 2) Exhibit A, which supports the allegations in ¶18; 3) the second sentence of ¶ 19; 4) ¶¶ 28 and 29, in their entirety; and 5) the last sentence of ¶ 53. NAMI argues that paragraphs 18, 19, 28, and 29 of the amended complaint improperly allege the same conduct that Insignia alleged in the 2000 litigation. Paragraph 53 explains that "no successful entry has occurred in" the in-store advertising and promotions products market in the last eight years.

### C. Motion To Disqualify Counsel

NAMI also argues that plaintiff's counsel, the law firm Collier Shannon, willfully violated the protective order and settlement agreement. NAMI asserts that the only way that this Court can ensure that there are no continuing violations of the protective order and settlement agreement is to disqualify plaintiff's counsel pursuant to Local Rule 83.6. Because the Court concludes that plaintiff's counsel did not violate either the protective order or settlement agreement, the motion to disqualify is denied.

## II. MOTION TO DISMISS THE AMENDED COMPLAINT

To simplify the analysis, the Court sorts Insignia's 14 claims into three groups: 1) unlawful boycott and exclusive dealing; 2) unlawful monopolization and attempted monopolization; 3) false advertising. In its amended complaint, Insignia adds two claims (counts 4 and 10) asserting an unlawful boycott among retailers that were not in the initial complaint.

### A. Standard of Review

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to plaintiff, as the non-moving party. *See, e.g., Bhd. of Maint. of Way Employees. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001). A motion to dismiss a complaint should not be granted unless it appears beyond a doubt that plaintiff can prove no set of facts that would entitle plaintiff to relief. *Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994). "[C]ourts are hesitant to dismiss antitrust actions before

- 5 -

the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).

      **B.**      **Unlawful Boycott And Exclusive Dealing** (Sherman Act § 1, Clayton Act § 3, Minn. Stat. §§ 325D.51 and .53 – New Counts 3 - 6, 8 - 11)

To establish a claim under section 1 of the Sherman Act, section 3 of the Clayton Act, or Minnesota Statute sections 325D.51 and 325D.53, a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; and (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis. *See Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 704 (D. Minn. 1998) (section 1 of the Sherman Act); *3M v. Appleton Papers Inc.*, 35 F. Supp. 2d 1138, 1142-43 (D. Minn. 1999) (analyzing claims under section 3 of the Clayton Act and section 1 of the Sherman Act together); *Howard v. Minn. Timberwolves Basketball Ltd.*, 636 N.W.2d 551, 557 (Minn. Ct. App. 2001) (stating that Section 1 of the Sherman Act is analogous to Minnesota Statutes sections 325D.51 and 325D.53).

Insignia alleges that NAMI and grocery retailers agreed to exclude NAMI's competitors so that NAMI could charge higher prices for shelf space to the manufacturers of packaged products. As a result, Insignia claims it is foreclosed from at least 87 percent of the relevant market and manufacturers pay higher prices for in-store advertising.

### 1.     Contract, combination, or conspiracy

The first issue is whether Insignia has alleged any fact showing that the grocery retailers' communications were part of a "contract, combination, or conspiracy," or in other words, a common scheme. Evidence of a formal agreement is unnecessary; an allegation that their conduct was "joint or collaborative" is sufficient. *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466, 469 (8th Cir. 1976); *see Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984) ("[T]he antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.").

Insignia's initial complaint alleged that Albertsons and possibly other unnamed retailers have entered into long term exclusive relationships with NAMI in exchange for unusually high up-front and guaranteed payments. The Court reasoned that offering a better deal than the competition is a time-tested competitive strategy, and concluded that Insignia's allegations were insufficient to indicate a common scheme.

In its amended complaint, Insignia provides specific allegations of a common scheme, relying on internal memoranda between grocery retailers and their managers. The memoranda were sent within 30 days of each other and all contain similar language. The letters tell managers that the grocery retailers have exclusive contracts with NAMI, and that managers should encourage vendors to utilize NAMI for in-store advertising. Insignia asserts that NAMI instructed the grocery retailers to send the memos, and drafted the memo for one grocery retailer. Insignia alleges that the three grocery retailers

(Albertsons, Ahold, and Kroger) were aware that NAMI asked each of them to send the memos and each sent the memos in reliance on the fact that the others would also do so. Insignia further alleges that the grocery retailers discussed excluding NAMI's competitors. For example, Insignia alleges that Ahold and Safeway discussed the amount of money that would be gained by excluding NAMI's competitors.

The Court concludes that Insignia's allegations are sufficiently specific for this stage of the litigation.

### 2.    Unreasonable restraint of trade

The second issue is whether Insignia alleges any fact showing that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis. Most agreements are evaluated under the rule of reason, a standard that asks whether the alleged contract or agreement unreasonably restrains trade in a relevant product or geographic market. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000). Certain kinds of agreements, however, are considered unlawful per se because they are of a type that is so often harmful and so rarely justified that proof of anti-competitiveness is not required. *Id.* (quoting *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998)).

#### a.    Per se violation – group boycott

Courts generally utilized the per se approach when there are joint efforts by a firm or firms to disadvantage competitors by "directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive

struggle." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). In these cases, the boycotting firms frequently possess a dominant position in the relevant market. *Id.* This Court previously held that Insignia had not sufficiently alleged a group boycott because it alleged only that Albertsons and possibly unnamed others arranged exclusive contracts.

Insignia alleges in its amended complaint that Albertsons, Ahold, and Kroger engaged in a group boycott with NAMI. Insignia makes specific allegations supporting the alleged group boycott, including that the grocery retailers discussed among themselves their exclusive contracts with NAMI and considered whether the retailers should demand larger payments from NAMI in exchange for this exclusivity.

Insignia draws a parallel with a case where the United States Supreme Court found a group boycott involving a retailer and several appliance manufacturers. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 212-14 (1959). In *Klor*, the plaintiff alleged that an appliance sales outlet used its monopolistic buying power to bring about a situation where the appliance manufacturers agreed that they would not do business with plaintiff, who was a competitor to the appliance sales outlet. *Id.* Similarly, Insignia alleges that NAMI used its dominant position in the market to bring about a situation where the grocery retailers would sign exclusive contracts with NAMI.

NAMI argues that the situation here can be distinguished from *Klor*, however, because there is no evidence of direct agreement among the grocery retailers, which makes the structure of the relationships mostly vertical. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 591 (8th Cir. 1987). In *Lomar*, the

Eighth Circuit held that refusals to deal involving no concerted action between horizontal competitors do not constitute per se unlawful group boycotts.

The structure of the group boycott is similar to that that alleged in *Klor*, and the nature of the relationships is more like *Klor* than *Lomar* because Insignia does allege a horizontal conspiracy among the grocery retailers. However, a question remains as to whether the alleged conspirators have sufficient market power. As discussed below, Insignia alleges that the grocery retailers acting in concert with NAMI have a market share of at least 87 percent, and the Court concludes that this allegation of market power is legally sufficient. *See Baxley-Delamar Monuments, Inc. v. American Cemetery Ass'n.*, 843 F.2d 1154, 1157 (8th Cir. 1988). Accordingly, the Court concludes that Insignia adequately alleges an unlawful group boycott.

### b.     Rule of reason

Exclusive dealing contracts are usually analyzed under the rule of reason. *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660 (8th Cir. 2000). There are two separate ways to apply the rule of reason: significant anti-competitive effects and market foreclosure. *Id.* at 706-07.

Significant anti-competitive effects may include an actual increase in the price of the good or service, a decrease in output, or a decline in quality. *Id*. In its initial complaint, Insignia alleged that in-store information and advertising has been reduced and that higher prices have resulted. The Court held that these broad, unsupported allegations could not withstand a motion to dismiss.

The amended complaint does not remedy this defect. Insignia again offers the conclusory allegations that NAMI has raised prices to manufacturers, and the output and quality of in-store advertising services has decreased. Insignia offers no indication of the amount of type or output decline, the ways in which quality of advertising has decreased, or a single price increase.

The only additional allegations in the amended complaint are that NAMI's competitors have been blocked from entry into the relevant market, and that Insignia has been severely harmed through lost sales and profits, higher costs, and loss of goodwill. Harm to competition, not harm to competitors, constitutes an anti-trust violation. *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 561 (8th Cir. 1998).

Because Insignia does not adequately allege actual detrimental effects, it must establish its rule of reason claim by showing that defendants have a dominant market share in a well-defined relevant market. *See Flegel v. Christian Hosp. Northeast-Northwest*, 4 F.3d 682, 689 (8th Cir. 1993); *see Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market."). In addition, a plaintiff needs to define both a geographic and product market. *See Minnesota Ass'n of Nurse Anesthetists,* 5 F. Supp. 2d 694, 707 (D. Minn. 1998). This Court previously held that it could not determine whether NAMI has a dominant market share because Insignia did not provide the percentage of the markets that the exclusive contracts constitute.

In its amended complaint, Insignia alleges that NAMI has at least 87 percent of the markets as a result of its exclusive long-term contracts with retailers, which is legally

sufficient.[3]  *See 3M v. Appleton Papers Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999) ("Generally speaking, a foreclosure rate of at least 30 percent to 40 percent must be found to support a violation of the antitrust laws."); 6 HOVENKAMP, ANTITRUST LAW ¶ 1821c, n.32 (2005) (summarizing case law on percentage foreclosure of the relevant market).

Insignia defines the relevant product market as "the sale of in-store advertising and promotion products and services to CPGs [manufacturers of consumer packaged goods] by third parties which are placed in retail grocery and drug stores."  Am. Comp. ¶ 4. Insignia alleges that 70 percent of purchasing decisions are made while the shopper is in the store, and thus in-store advertising has unique characteristics and precludes other forms of advertising as acceptable substitutes.  As for the relevant geographic market, Insignia alleges that the entire United States, each Metropolitan Statistical Area, and regional markets are relevant geographic markets.

Defendants urge this Court to reject Insignia's definition of the relevant market. For example, NAMI argues that newspaper coupons should be included in the relevant product market.  As the parties' exhaustive briefing on this issue illustrates, market definition is a deeply fact-intensive inquiry.  Insignia's market definition is not implausible based on its allegations, and defendants' arguments are more suited for a motion for summary judgment than a motion to dismiss.  *See Michael Anthony Jewelers,*

---

[3] Albertsons focuses on the small market share occupied by Albertsons, but this focus is inappropriate because Insignia alleges a conspiracy among the grocery retailers.  At the pleading stage, it is sufficient to plead that defendants as a group have substantial market power.  *See Baxley-Delamar Monuments, Inc. v. American Cemetery Ass'n*, 843 F.2d 1154, 1157 (8th Cir. 1988) (analyzing "collective market share" in a motion to dismiss).

*Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992).  Therefore, the Court concludes that Insignia adequately alleges that defendants have a dominant market share in the relevant market.

Because Insignia's amended complaint sufficiently alleges a common scheme and an unreasonable restraint of trade, the Court denies defendants' motion to dismiss Insignia's claims of unlawful boycott and exclusive dealing.

    **C.**    **Unlawful Monopolization** (Sherman Act § 2 and Minn. Stat. § 325D.52 – New Counts 1, 12) **and Attempted Monopolization** (Sherman Act § 2 and Minn. Stat. § 325D.52 – New Counts 2, 13)

To make out a claim of unlawful monopolization under either section 2 of the Sherman Act or its Minnesota corollary, Minnesota Statute section 325D.52, a plaintiff is required to plead and, ultimately, prove that the defendant "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining it as a result 'of a superior product, business acumen, or historical accident.'"  *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998); *Howard v. Minn. Timberwolves Basketball Ltd.*, 636 N.W.2d 551, 556 (Minn. Ct. App. 2001)  (stating that Minnesota antitrust law should be interpreted consistently with federal court interpretations of federal antitrust law unless Minnesota law clearly conflicts.).  This Court dismissed Insignia's claims of unlawful monopolization in the initial complaint because Insignia failed to show adequate market power.

To prevail on a claim of attempted unlawful monopolization, Insignia must prove "(1) a specific intent by the defendant to control prices or destroy competition;

(2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 803 (8th Cir. 1987). This Court dismissed these claims in the initial complaint because it found that Insignia failed to establish dangerous probability of success because it did not demonstrate NAMI's market power.

In support of its claims of unlawful monopolization and attempted monopolization, Insignia essentially reiterates the market power analysis that supports its § 1 claim. Defendants similarly rely on their discussion of the § 1 claim. Because the Court concludes that Insignia adequately alleges market power for the § 1 claim, and the parties offer no independent analysis for the unlawful monopolization and attempted monopolization claims, the Court denies defendants' motion to dismiss these claims.

      **D.**    **False Advertising Claims** (Lanham Act and Minnesota Deceptive Trade Practice Act -- New Counts 7, 14)

To establish its false advertising claims, Insignia must establish (1) a false statement of fact made in a commercial advertisement, (2) which actually deceived or had a tendency to deceive a substantial segment of the intended audience, (3) which was material in that it was likely to influence purchasing decisions, (4) and that NAMI caused the false or misleading statement to enter interstate commerce; (5) which has or is likely to injure Insignia, in the form of lost sales or lost goodwill. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998). To be commercial advertising under

Lanham Act one's statements must be "disseminated sufficiently to the relevant purchasing public . . . within that industry." *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1121 (8th Cir. 1999).

This Court dismissed the false advertising claims in the initial complaint because Insignia failed to allege a false statement. The Court reasoned that the allegations indicated that NAMI made objectionable statements about Insignia to manufacturers and retailers in connection with its own sales, but there were no allegations of an actual advertising campaign to discredit Insignia.

In its amended complaint, Insignia alleges that NAMI sent a fax to 175 manufacturers of packaged products falsely stating that Insignia's "compliance rate" was less than 20 percent even though the rate was actually greater than 70 percent. Insignia also alleges that NAMI falsely stated to manufacturers and retailers that NAMI was authorized to take down Insignia signs, and that Insignia's "POPSign" advertising was not authorized to contain brand equity.

NAMI argues that faxes and internal memos cannot amount to an organized advertising campaign, and therefore cannot qualify as commercial advertising. Because Insignia alleges that this false statement was disseminated "to virtually every current and potential [manufacturer of packaged goods] customer in the country," the Court concludes that Insignia's allegations are sufficient to support its claims of false advertising. Accordingly, the Court denies defendants' motion to dismiss Insignia's claims of false advertising.


### E. Conclusion

Based on its allegations in the amended complaint, the Court is somewhat skeptical that Insignia will ultimately prevail on its claims in this case. Nevertheless, the Court finds that the amended complaint offers numerous specific allegations, and addresses the Court's concerns over the initial complaint. Accordingly, the Court denies defendants' motion to dismiss.

### ORDER

Based on the foregoing, all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant News America Marketing In-Store, Inc.'s motions to strike information from amended complaint and disqualify plaintiff's counsel [Docket No. 72] are **DENIED**.

2. Defendant News America Marketing In-Store, Inc.'s motion to dismiss [Docket No. 56] is **DENIED**.

3. Defendant Albertson's Inc.'s motion to dismiss [Docket No. 59] is **DENIED**.

DATED: June 30, 2006  
at Minneapolis, Minnesota.

        s/ John R. Tunheim  
        JOHN R. TUNHEIM  
        United States District Judge