UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

INSIGNIA SYSTEMS, INC.,                                CIVIL NO. 04-4213 (JRT/AJB)

          PLAINTIFF,

V.                                                                         **REPORT AND**
                                                                               **RECOMMENDATION**

NEWS AMERICA MARKETING IN-STORE, INC., ET AL.,

          DEFENDANTS.

      This matter is before the Court, United States Magistrate Judge Arthur J. Boylan, on Defendant News America Marketing In-Store, Inc.'s ("NAM") Motion for Adverse Inference Instruction to Jury for Plaintiff Insignia Systems, Inc.'s ("Insignia") Spoliation of Evidence [Docket No. 434]. Said motion was referred to the undersigned by the Honorable John R. Tunheim for findings of fact and a recommendation for the disposition of the motion upon completion of a hearing [Docket No. 442]. A hearing was held on December 23, 2008, in the United States Courthouse, 316 N. Robert St., St. Paul, MN 55101. Stephen Wood, Esq. and Jason C. Tarasek, Esq., represented Insignia. Matthew L. Cantor, Esq., and Todd A. Wind, Esq., represented NAM.

      Based upon the record, exhibits, memoranda, and oral arguments of counsel, **IT IS HEREBY RECOMMENDED** that NAM's Motion for Adverse Inference Instruction to Jury for Insignia's Spoliation of Evidence [Docket No. 434] be **DENIED**.

1

Dated:   January 29, 2009

       s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

**MEMORANDUM**

**I. BACKGROUND**

On March 17, 2005, members of Insignia's Board of Directors recommended that Cohen Independent Research Group ("CIRG")[1] be retained to prepare a report regarding its stock performance. See Ex. C [Docket No. 440].  It was agreed that Insignia's CEO, Scott Drill, would contact CIRG. Id. Sometime in March or April 2005, Insignia asked CIRG "to do a confidential report for the [its] board of directors that would analyze various financial line items within their income statement, cash flow, and balance sheet." See Cohen Dep. at 42:4-9, 48-49; see also Drill Dep. 224:22-225:21 [Docket No. 452].  Subsequently, CIRG conducted its analysis of Insignia. Almost all the information that CIRG reviewed was provided by Insignia, including account

---

[1] Public corporations hire CIRG to "write research reports and make the research reports available to the investment community." See Ex. D (Cohen dep.. 8:14-16)[Docket No. 440]. Paul Cohen, the President of CIRG, is the main contact with its clients. Id. at 10:1-6. Independent analysts are contracted by CIRG to prepare said financial reports based on the information provided by the client, as well as other researched sources that are necessary for them to understand the company. Id. at 9:1-18.

analyses, sales analyses, legal bills, and documents concerning its sales commissions and salaries, as well as publicly-available SEC filings (e.g., 10K and 10Q reports). See Cohen Dep. 53:9-13, 53:25-54:6; see also Drill Dep. 238:7-21; Cohen Decl. ¶ 5 [Docket No. 453].

On or about May 14, 2005, CIRG completed its report and delivered it to Insignia. See Cohen Dep. 69:16-23. The report's "Investment Thesis" discussed the history of Insignia's litigation with NAM, as well as provided an assessment of Insignia's legal fees. See Ex. E, CIRG Rep. 8-21 [Docket No. 440]. The report concluded, *inter alia*, that Insignia should reduce its legal expenses and that the sales department should "be restructured towards incentives to create new sales, not to hand hold existing accounts." Id. at 8, 29.

After receiving the report in May 2005, Mr. Cohen was under the impression that Insignia "thought it was an excellent report...and that they were very pleased with it." See Cohen Dep. 75:17-19. However, he also believed that Insignia was "concerned about the appropriate of [the report] because...[of] their litigation [against NAM], and...for that reason Jim Diracles[2] wrote [Cohen] and said look, destroy everything." Id. at 75:20-23. Cohen could not recall whether preliminary drafts of this report were ever sent to Insignia for review. Id. at 74:13-75:6.

The report was thereafter discussed at the Insignia Board of Directors meeting on May 18, 2005. See Ex. F [Docket No. 440]. The Board "was dissatisfied with a number of aspects about the draft...[and] agreed that they did not want Mr. Cohen to complete the report, and

---

[2] Mr. Diracles was outside counsel to Insignia at that time.

directed Mr. Drill to contact Mr. Cohen and request that he return all information about the Company in his possession and do no further work." Id.

Later that month, Mr. Diracles sent CIRG a letter requesting a return letter confirming that CIRG: (1) agree that all the information provided to them by Insignia was confidential and not to be disclosed by them or anyone other that Insignia's director and employees; (2) return all of the information it received from Insignia; (3) destroy any copies of the materials received from Insignia and the report to its Board of Directors; (4) be aware that they have non-public information concerning Insignia that was subject to state and federal insider trading rules; and (5) neither retain nor provide to anyone copies of the report. See Ex. G [Docket No. 440].[3] Upon receiving CIRG's agreement to those terms, Insignia would then forward $10,000.00 to CIRG for their work. Id. Mr. Cohen testified that receiving such a request from one of their clients was "rare." See Cohen Dep. 87:15-23.

Cohen later testified at deposition that he followed Insignia's instructions from the May 26th letter and destroyed all materials CIRG possessed that had been provided by Insignia:

> Q. Okay. After receiving that letter and the instruction from Insignia to destroy records and documents, how did you go about destroying those documents?
>
> A. Just deleted the files.
>
> Q. Can you describe more specifically which files you deleted?

---

[3] NAM notes that while Mr. Drill believed that CIRG possessed all the materials Insignia had (Drill Dep. 235:25-236:1), there was never any inspection conducted to confirm that CIRG did not maintain any materials that Insignia did not possess, such as notes or report drafts. Id. at 236:3-11.

> A. They were in a folder, and I just deleted the whole thing.
>
> Q. Did you delete any other documents from Insignia–pardon me. Which documents were those in that folder?
>
> A. I can't remember.
>
> Q. Were they the documents that were sent to you by Scott Drill?
>
> A. Yeah, everything I had in there. Whatever was in our research file. I just zapped it.
>
> Q. Okay. What else did you destroy?
>
> A. That was it. Everything that I had was in a file, and we just destroyed the file.
>
> Q. Did you have any paper documentation from your work with Insignia?
>
> A. I can't recall, unless maybe there was the original contract, and I probably destroyed that, but I can't remember it.[4] I didn't have any file in my file cabinet on Insignia. The only thing that I had was the bill and Diracles' letter, I think. That was all that was in there.
>
> Q. And did you destroy what–included in that folder, was all the communication with Insignia in that letter-or in that folder? Let me ask that again. Included in that folder, was there the communication with Insignia?
>
> A. I have no idea. I can't recall...
>
> A. I can't recall [how many total documents were deleted]. It's whatever Insignia sent to me. You probably have records of what they sent to me, and whatever they sent to me was sitting in my folder. Id. at 80:8-82:10.

---

[4] Based on a reading of relevant portions of Mr. Drill's deposition testimony, Cohen later states that there was no written contract executed which explained why he did not have a copy of any written agreement with Insignia. See Cohen. Decl. ¶ 9.

5

Pursuant to a letter sent by Mr. Cohen to Insignia on June 23, 2008, the only two documents that CIRG retained concerning their research report for Insignia were Diracles' letter and CIRG's $10,000.00 invoice to Insignia. See Cohen Dep., Ex. 5.

NAM claims that Insignia instructed CIRG to intentionally destroy the report and all other documents utilized by CIRG in preparing the report, including any notes or drafts and that Insignia would pay CIRG only upon certification that all Insignia-related documents had been in fact destroyed. See Defs.' Mem. 1-2 [Docket No. 435]. "On information and belief," no underlying notes, analyses, or drafts of the CIRG report were produced in response to NAM's subpoenas to Mr. Cohen. See Cantor Decl. ¶ 3 [Docket No. 440]. On that same understanding, NAM states that Insignia "did not produce any of the correspondence sent to Mr. Cohen that enclosed the financial and likely other documents with which he was provided." Id. at ¶ 4.

Due to Insignia's instruction that CIRG destroy all materials related to its report, NAM asserts that Mr. Cohen's testimony was "substantially compromised." See Defs.' Mem. 8. There were several instances where Mr. Cohen could not recall certain conversations with Insignia and documents related to its report. See Cohen Dep. 45:4-5; 50:9-10; 51:3-6, 18-19; 77:6-8; 80:17-20; 81:3-16. NAM claims that "Cohen's lack of recollection precluded [them] from understanding Insignia's relationship with CIRG through testimony, under circumstances where documentary evidence of this relationship had been purged at Insignia's instruction." See Defs.' Mem. 8. Thus, the destruction of report documents prejudiced NAM in that they were unable to refresh Mr. Cohen's memory at the deposition. Id.

As a result of these actions by Insignia, NAM now moves this Court to (1) provide an adverse inference jury instruction for purposes of summary judgment and trial in order to remedy the prejudice that NAM has incurred due to Insignia's intentional bad faith destruction of the CIRG report and supporting documents; (2) preclude Insignia from challenging the accuracy and reliability of the CIRG report for purposes of summary judgment and trial; and (3) grant any other relief that this Court deems appropriate, just, and equitable. See Defs.' Mem. 19.  More specifically, NAM requests an adverse inference instruction that the documents destroyed at the direction of Insignia were unfavorable to Insignia's case in that they showed that Insignia's financial losses were caused by its own conduct rather than by NAM. Id. at 19.

## II. DISCUSSION

Spoliation is defined as the "intentional destruction, mutilation, alteration, or concealment of evidence." BLACK'S LAW DICTIONARY 1409 (7th ed. 1999).  There must be a finding of intentional destruction indicating a desire to suppress the truth before an adverse inference instruction is justified. Morris v. Union Pac. R.R., 373 F.3d 896, 901 (8th Cir. 2004)(emphasis added).  A spoliation sanction requires a finding of "intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation." Greyhound Lines, Inc. v. Wade, 485 F.3d 1032, 1035 (8th Cir. 2007)(citing Morris, 373 F.3d at 901).  A court may rely upon inferences to find requisite intent on behalf of the spoliator to destroy the evidence and suppress the truth. Morris, 373 F.3d at 902.  "Intent is rarely proved by direct evidence, and a district court has substantial leeway to determine intent through consideration of

circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." Id. at 901.  Second, there must be a finding of prejudice to the opposing party before imposing a sanction for destruction of evidence. Dillon v. Nissan Motor Co., Ltd., 986 F.2d 263, 267 (8th Cir. 1993).

**A. Intentional Destruction**

In this case, Insignia could be found to have committed spoliation justifying an adverse inference sanction if it intentionally destroyed the CIRG report, drafts of said report, supporting materials provided by Insignia and analyzed by CIRG, in an attempt to suppress the truth.  The intentionality requirement means that the destruction must have been purposeful.  The purpose the destruction must serve is that of obscuring the truth.  Although the materials at issue in this case were not in Insignia's immediate possession at the time they were destroyed, the disposition of said documents were under the direction and control of Insignia.

As NAM points out, "It is undisputed that, while this litigation was pending in this Court, Insignia's counsel, at the behest of Insignia, instructed CIRG to destroy the documents in its possession related to Insignia (including all copies of the CIRG report and all documents on which that report was based)...[and] that, pursuant to Insignia's instruction, CIRG did so." See Defs.' Mem. 12.  "It was precisely because of this litigation that Insignia instructed Mr. Cohen to destroy all copies of the report and all documents that Insignia had sent to CIRG." Id. at 13. NAM opines that Insignia instructed Mr. Cohen to destroy documentation relevant to his report at the same time they were formulating evidence in this litigation to undermine his conclusions concerning the financial state of Insignia. See Tr. 7:2-11 [Docket No. 469].

Nonetheless, the Court does not find that the record shows that the documents were destroyed as a result of any ongoing or anticipated litigation. As Insignia points out, "There is no reference in the Diracles letter to the litigation with News America, or any other litigation." See Pl.'s Mem. 9 [Docket No. 455]. Additionally, the Court is not persuaded by NAM's argument that CIRG's services were connected to this litigation through the discussions Insignia's Board had on these topics. See Defs.' Mem. 13. Upon review of both the Board meeting minutes from March 17, 2005 (Ex. C), and May 18, 2005 (Ex. F), the Court would note that both the CIRG report and the case in front of this Court were discussed, however, the Court holds there is no indication or reasonable inference that can be drawn from these meeting minutes that suggests the report was prepared and thereafter ordered to be destroyed due to the pending litigation.

NAM is then left with the argument that Mr. Cohen testified at his deposition that Insignia was "concerned about the appropriateness of [the report] because of...their litigation, and [he thought] for that reason Jim Diracles wrote him and said look, destroy everything." See Cohen Dep. 75:20-23. Upon review of the record, the Court does not agree with NAM's assertion that the pending litigation with NAM was Diracles' reason for having the files returned and destroyed.

Insignia claims that all of the information provided to CIRG was "confidential and not intended for public dissemination." See Pl.'s Mem. 19. A significant portion of this information qualified as "material nonpublic" that if disclosed would be subject to federal securities

9

regulations. Id. at 19-20. For example, Regulation FD, was enacted to preclude "selective disclosure" of material nonpublic information about a company to selected persons (including those acting on its behalf), such as securities analysts or institutional investors, before disclosing the information to the general public. "[Selective disclosure/insider trading] undermines the integrity of the securities markets and reduces investor confidence in the fairness of those markets...[it] may also create conflicts of interest for securities analysts, who may have an incentive to avoid making negative statements about an issuer for fear of losing their access to selectively disclosed information. Id. at 20 (citing Selective Disclosure & Insider Trading Act Release, http://www.sec.gov/rules/funal/33-7881.htm). It is for this reason, along with several other arguments made by Insignia related to compliance with securities laws (see Pl.'s Mem. 19-22), that the Court is persuaded by Insignia's contention that they were "required...to retrieve information from Mr. Cohen to prevent him from making selective disclosure for which [they] would be responsible." Id.; see also Drill Dep. 238:2-16 ("The reason [Insignia asked for the return of all materials] is that the report contained invertible plethora of nonpublic information which Mr. Cohen should not be discussing with any shareholders or anyone other than someone at Insignia.").[5] The May 26, 2005, letter to Cohen from Diracles confirms that the information Insignia provided to Cohen was "confidential" and "non-public information." See Ex. G [Docket No. 440]. Even Mr. Cohen testifies that Insignia wanted him "to do a confidential report for the board of directors that would analyze various financial line items within their income statement,

---

[5] This duty was significantly heightened after Cohen accidentally sent a copy of the report to Paul Kessler, a representative of Bristol Capital. See Pl.'s Mem. 20; see also Cohen Dep. 70:5-9. Bristol Capital was an institutional investor in Insignia in 2005. See Drill Dep. 223:2-16.

cash flow, and balance sheet." See Cohen Dep. 42:6-9 (emphasis added).

While it is also true that Insignia's President Gary Vars testified that he disagreed with the CIRG report and wrote a memo to the Board in response to the report, the Court is further dissuaded by NAM's argument that this testimony bolsters their argument that the documents were destroyed because of the litigation. See Defs.' Mem. 3 [Docket No. 485]. Mr. Vars merely stated, "I disagreed with just about everything [in the report] because they didn't attempt to understand the industry. They took a lot of national numbers and tried to draw conclusions from that without looking at the consequences within the industry that we were working in." See Vars Dep. 253:9-15. Vars makes no mention of the pending litigation with NAM. Moreover, Cohen later admitted that his statement was his "own conjecture, and not anything anyone else from Insignia, including Mr. Diracles, or anyone else communicated to [him]. See Cohen Decl. ¶ 8 [Docket No. 452]. Therefore, the Court places no persuasive weight on Cohen's statement that the destruction of the report and supporting documents was ordered due to Insignia's pending suit with NAM.

Finally, NAM asserts that "Mr. Cohen never addresse[d] whether he destroyed any notes-either free-standing or on copies of documents provided to him by Insignia-analyses, drafts or other documents in preparing the Cohen report." See Defs.' Mem. 2 [Docket No 458]. The Court, however, finds that there was no record of any notes or analyses separate from the materials Insignia provided to CIRG. To the best of his recollection, Cohen testified that he did not have any paper files on Insignia, other than the invoice and Diracles' letter. See Cohen Dep.

11

81:7-9. He did not rely on any other information in preparing the report for Insignia other than the materials he received from Insignia, as well as publicly-available financial information from SEC filings. See Cohen Decl. ¶ 5; see also Cohen Dep. 54:8-13 ("I know what information it is that we wrote and what information was sent, and the body of the report, primarily, was information that was sent to us.") The record does not indicate that Cohen conducted any independent research or investigation of the materials Insignia provided. See Cohen Decl. ¶ 5-6. Cohen states, "We didn't make up any information...we just analyzed the information that was sent to us." See Cohen Dep. 54:9-13.

In conclusion, the evidence does not support a finding that the CIRG report and supporting materials were destroyed with intent to suppress the truth. Thus, there is no need to consider whether NAM was prejudiced by the destruction of evidence for the purpose of considering spoliation sanctions. Nonetheless, for the sake of argument, the Court would find NAM's prejudice minimal at best. Cohen states that while he testified that Mr. Diracles told him to "destroy everything," the letter did not in fact instruct him to destroy everything. See Cohen Decl. ¶ 7. Cohen need "only to destroy 'copies of the materials [he] received from the Board of Directors'" and the May 31, 2005, email to Mr. Diracles confirmed that he "destroyed 'only copies [he had] of the materials [he] received from Insignia and [his] report to the Board of Directors.'" Id. (emphasis added). Cohen did was he was instructed to do by Insignia, and as previously noted, Cohen's deleted files only contained those documents provided by Insignia. See Cohen Decl., Ex. C.

NAM also cannot claim to be prejudiced because Cohen's deposition could not be fully

developed due to the lack of documents. Insignia argues that all the disputed documents were in fact available to NAM at the time of Cohen's deposition. See Pl.'s Mem. 24-25. Document Bates Nos. IS07-E-0014937 to IS07-e-0014938; IS-07-E-00546610; IS07-E-0696475 to IS07-E-0696476; IS07-E-0696532; IS07-E-0696723; IS07-723698 to IS07-723699; IS07-723702 to IS)&-723706; IS07-E-0782413; IS07-E-0782411; IS07-E-0782412; IS07-E-0782410; IS07-442776; and IS07-E-0782409 are copies of the documents Insignia produced to NAM relating to Mr. Cohen. See Pl.'s Mem. 5. Insignia has also produced copies of the actual CIRG report. Id.[6] While it is still unclear at what time Insignia produced the Exhibits A-C to Mr. Cohen's Declaration, the fact that these documents were produced at some point during the discovery process further supports the Court's finding that Insiginia did not intentionally destroy documents to suppress the truth. See Tr. 29:8-33:5; see also Certification of Bates Nos. For Exhibits A-C of Cohen Decl. [Docket No. 467]. Accordingly, the Court finds that NAM's motion for adverse inference instruction for spoliation by Insignia should fail.

*AJB*

---

[6] Insignia marked the four copies of the CIRG report as: IS07-E-696724 to IS07-E-0696913; IS07-68013 to IS07-680320; IS07-E-0696533 to IS07-E-0696722; and IS07-697694 to IS07-679883.

**Notice**

Pursuant to Local Rule 72.2 (a), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals. Written objections must be filed with the Court before **February 11, 2009.**