# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| INSIGNIA SYSTEMS, INC., | Civil No. 04-4213 (JRT/AJB) |

Plaintiff,

v.

NEWS AMERICA MARKETING IN-
STORE, INC.,

Defendant.

_____

NEWS AMERICA MARKETING IN
STORE, INC.,

Counterclaim Plaintiff,

v.

INSIGNIA SYSTEMS, INC., and
SCOTT DRILL,

Counterclaim Defendants.

**MEMORANDUM OPINION
AND ORDER**

---

Stephen Wood and Julian Solotorovsky, **KELLEY DRYE & WARREN LLP**, 333 West Wacker Drive, Suite 2600, Chicago, IL 60606; Kevin J. Smith and Richard E. Donovan, **KELLEY DRYE & WARREN LLP**, 101 Park Avenue, New York, NY 10178; John T. Delacourt, and Lee Istrail, **KELLEY DRYE & WARREN,** 3050 K Street Northwest, Suite 400, Washington, DC, 20007-5108; and Robert L. Meller, Jr. and Jason C. Tarasek, **BEST & FLANAGAN LLP**, 225 South Sixth Street, Suite 4000, Minneapolis, MN 55402-4690, for Insignia Systems, Inc. and Scott Drill.

Matthew L. Cantor, Ankur Kapoor, Kerin E. Coughlin, Jeffrey I. Shinder, and Samuel H. Rikkers, **CONSTANTINE CANNON LLP**, 450 Lexington Avenue, 17th Floor, New York, NY 10017; Seth Greenstein, Mitchell

Stoltz, Raymond C. Fay, **CONSTANTINE CANNON LLP**, 1627 Eye Street Northwest, 10th Floor, Washington, DC 20006; Julie Ann Shepard, David R. Singer, and Richard L. Stone, **HOGAN & HARTSON**, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067; and Todd A. Wind and Sarah C. S. McLaren, **FREDRIKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425, for News America Marketing In-Store, Inc.

Plaintiff and counterclaim defendant Insignia Systems, Inc. ("Insignia") and defendant and counterclaim plaintiff News America Marketing In-Store, Inc. ("NAMI") are direct competitors in the in-store promotions business. Insignia filed this suit against NAMI alleging violations of federal and state antitrust law, and for disparagement under the Lanham Act, 15 U.S.C. § 1125, and the Minnesota Deceptive Trade Practices Act ("MDTPA"), Minn. Stat. § 325D.44.   NAMI filed counterclaims alleging that Insignia wrongfully induced retailers to breach their contracts with NAMI and that Insignia's president, Scott Drill, made false, disparaging comments about NAMI in violation of federal and state law.   The case is before the Court on NAMI's motion for summary judgment on Insignia's claims, Insignia and counterclaim defendant Scott Drill's' motions for summary judgment on NAMI's counterclaims, NAMI's motion to exclude, and Insignia's motion to compel discovery.   For the reasons below, the Court denies the parties' motions for summary judgment, denies NAMI's motion to exclude, and grants the motion to compel.

# BACKGROUND

## I.   THE IN-STORE PROMOTIONS BUSINESS

Insignia and NAMI are prominent companies in the third-party in-store promotions and advertising business.  Third-party promotions companies ("TPPs") such as Insignia and NAMI enter into contracts with product manufacturers, also known as consumer packaged goods companies ("CPGs"), and retailers.  TPPs sell CPGs advertising tactics and services for placing products in retail stores.  TPPs purchase from retailers the right to place those tactics in the retail stores.

### A.   Contracts with CPGs and Retailers

TPPs potentially provide two layers of exclusivity that have value to CPGs: category exclusivity and retail exclusivity.  TPPs compete to sell CPGs a variety of promotional tactics for placement in retail stores, including print and electronic signage in the store, end-of-aisle displays, freezer displays, floor signage, cart advertising, and coupons.  (Overstreet Report, Docket No. 516, Ex. 3 at 21-36.)  CPGs typically demand that TPPs promote only their products within a particular product category for specified periods of time.  Referred to as "category exclusivity," the TPP guarantees that it will not sell similar advertising tactics to another CPG in the same product category during certain "cycles," often four-week periods.  CPGs also promote their products through "trade" promotions at retail stores, bypassing the TPPs and working directly with retailers.

TPPs also contract with retailers to purchase the right to place promotional tactics, which advertise CPGs' products, in the retail stores.  A variety of retailers use in-store promotions, including grocery stores, drug chains, mass retailers, home improvement stores, and bargain chains.  NAMI often includes clauses in its retail contracts providing for "retail exclusivity."  That is, NAMI seeks to secure the exclusive right to provide certain promotional vehicles in particular retail stores, to the exclusion of other TPPs with similar promotional vehicles.  Retail exclusivity can maximize the effectiveness of in-store advertising for CPGs, and CPGs apparently pay more to TPPs that are able to secure retail exclusivity, because such exclusivity enables CPGs to advertise in certain stores in the absence of advertising from their competitors.  (Overstreet Dep. Tr., Docket No. 476, Ex. 4 at 263, Ex. 5 at 498; Payton Dep. Tr., Docket No. 476, Ex. 6 at 137.)

### B.      Third-Party In-Store Promotions Companies

NAMI offers a variety of advertising tactics to CPGs, including shelf-mounted machines that dispense coupons or rebates (SmartSource Coupon Machines and SmartSource ShelfTake One), floor decal advertisements (FloorTalk), and shopping cart advertisements (SmartSource Carts).  NAMI also offers two at-shelf signage tactics: Shelftalk, which is an "at-shelf" sign with a brand message; and Price Pop Guaranteed ("Price Pop"), which is an at-shelf sign with product prices.  NAMI claims that its extensive array of promotional tactics gives it a competitive advantage because a CPG can do "one-stop shopping" with NAMI for all of its in-store promotion needs.

NAMI does not dispute that its contracts with retailers often incorporate retail-exclusivity clauses to secure NAMI's ability to be the exclusive provider of particular categories of in-store advertising tactics. NAMI notes, however, that many retailers negotiate to "carve-out" exceptions to these exclusivity provisions for particular tactics offered by other TPPs or by the retailer itself.

Insignia's promotional offerings are more limited. Indeed, it appears that Insignia's most predominant and successful offering is the "POPSign" at-shelf advertising tactic, which incorporates both brand equity messaging and product price, and is designed to attract consumer attention at the point of purchase. In 2006, Insignia sold POPSigns to 57 CPGs and, as of 2008, Insignia placed POPSigns in 9,000-10,000 retail stores. (Overstreet Report, Docket No. 476, Ex. 3 at 21 n.22.) Insignia's POPSigns are in direct competition with NAMI Price Pop, and Insignia appears to have had success: in 2007, Insignia's POPSign revenues were over $20.8 million, while NAMI's revenues for Price Pop sales were only $2.76 million. (Murphy Report, Docket No. 476, Ex. 1, at Ex. 3.)

FLOORgraphics ("FGI") also competes with NAMI and Insignia for in-store advertising placements, offering floor decals that are affixed to floors of a store aisle. According to Insignia, FGI generated revenues of nearly $70 million in 2002 by selling a variety of at-shelf advertising products, including floor decals. Insignia asserts that by 2007, however, FGI's revenues had fallen to $13 million and were based solely on sales of floor decals. (Overstreet Report, Docket No. 516, Ex. 3 at 30; Jones Decl., Docket No. 516, Ex. 7, ¶ 11(A).)

Many TPPs offer services to CPGs, including NAMI, Insignia, FGI, Vestcom, Menasha, and Catalina Marketing.  Insignia asserts, however, that among all TPPs, there are only three main competitors for at-shelf, in-store advertising – NAMI, Insignia, and, to a far lesser extent, FGI.  Insignia notes that the revenue for the top three firms providing advertising services to CPGs grew from $292 million to $393 million between 2002 and 2006.  (Overstreet Report, Docket No. 516, Ex. 3 at tbl.22.)  Insignia explains that NAMI and Insignia accounted for more than all of that growth because FGI revenues declined over that period.  Further, Insignia states that NAMI alone accounted for 90 percent of the growth.

## II.     THE COMPLIANCE AUDIT

### A.     NAMI's Decision to Discontinue Its Retailer-Installed Program

TPPs manage the implementation of in-store tactics either by having retailers install the tactics, or by providing their own field force to install the tactics and oversee compliance.  TPPs measure compliance rates based on the percentage of contracted-for signs actually mounted in retail stores.  Under Insignia's business model, retailers are responsible for hanging POPSigns in retail stores.  NAMI notes that compliance rates on retailer-installed programs are inferior to compliance rates for field-force-installed programs.  Indeed, given the lower compliance rate for retailer-installed Price Pops, NAMI discontinued retailer installation in 2003. NAMI thereafter began offering a field-force-installed Price Pops program and was able to guarantee at least 90 percent compliance.

Prior to discontinuing its retailer-installed program, NAMI conducted an audit of the compliance rates of several third-party programs, including Insignia's retailer-installed POPSigns.  (Peiser Dep. Tr., Docket No. 476, Ex. 23 at 33-39.)  According to NAMI, that audit revealed that Insignia's retailer-installed program had extremely low compliance rates of less than 20 percent.  (Porco Letter, Docket No. 476, Ex. 47.)  NAMI also reported that FGI's compliance rate was less than 50 percent.  (*Id.*)

Insignia contends that the audit was methodologically flawed and inaccurate, and that NAMI was aware of those problems.  Insignia contends that its compliance rate was 75% or higher during the relevant time period.  Insignia also contends that NAMI ignored potentially higher compliance rates; misrepresented the size of NAMI's field force, which according to NAMI included 10,000 employees; and misrepresented the source of the audit data by claiming that syndicated data suppliers conducted the audits.

### B.    The Porco Letter

Based on the audit results, NAMI discontinued its own retailer-installed Price Pops program in favor of a field-force-installed program.  In February 2003, NAMI president Dominic Porco sent a communication (the "Porco Letter") to CPGs about the results of NAMI's audit to promote its new model for field-force-installed Price Pops tactics.  The Porco Letter stated, in relevant part:

> Did you know that most in-store marketing services providers rely on retailers or subcontracted field labor to execute the programs that YOU buy?  This means that on average, less than half the stores that you contracted for are ultimately installed.  Less than half!  We know that from a variety of sources, including client feedback, industry intelligence and a range of audit studies.  In fact, our latest audit studies confirm this, as the

results indicated that FLOORgraphics compliance averages were once again below 50%. Even more glaring is that in these same studies, Insignia POPS was found to have executed in less than 20% of the stores we surveyed. Certainly, this is not the most optimal spend of your media dollars. After all, how effective can an in-store program be if it's not actually seen in-store?

At News America Marketing, we operate differently. We take field execution extremely seriously. We have a dedicated in-house Field force that is 10,000+ people strong. These field professionals are our employees. They are not subcontracted. As a result, we are able to consistently deliver average compliance rates of 90-95%!

(Porco Letter, Docket No. 508, Ex. 61 at NA07-0878361.)

In the course of its business efforts, NAMI continued to use those compliance figures in marketing and sales materials that NAMI distributed to CPGs.

## III.   THE PARTIES' CLAIMS AND PROCEDURAL POSTURE

On September 23, 2004, Insignia filed an action against NAMI in the United States District Court for the District of Minnesota. In its Amended Complaint, Insignia alleges that NAMI violated various federal and state antitrust laws by entering into exclusive contracts with retailers and by distributing disparaging comments to CPGs. Insignia also alleges that NAMI violated the Lanham Act and the Minnesota Deceptive Trade Practices Act ("MDTPA"). NAMI filed an amended answer with counterclaims in January 2007. NAMI asserts claims for tortious interference, unfair competition, and deceptive trade practices. NAMI alleges additional claims against Insignia and Insignia president Scott Drill for violations of the Lanham Act and the MDTPA, and for defamation *per se*.

The parties moved for summary judgment on the respective claims. In conjunction with NAMI's motion for summary judgment, NAMI moved to exclude three declarations submitted by Insignia, as well as damages estimates that Insignia management provided to Insignia's damages expert. Insignia also moved to compel discovery of materials for use at trial, and the Court took that motion under advisement without oral argument.

The Court begins by addressing NAMI's motion for summary judgment and, within that analysis, NAMI's motion to exclude. The Court then turns to Insignia's motion for summary judgment on the counterclaims, and concludes with Insignia's motion to compel.

## DISCUSSION

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    NAMI'S MOTION FOR SUMMARY JUDGEMENT

### A.    Insignia's Claims

Insignia brought twelve federal and state claims against NAMI,[1] which can be roughly categorized into three groups: (1) unlawful monopoly or attempted monopoly under Section 2 of the Sherman Act and under the Minnesota Antitrust Act, Minn. Stat. § 325D.52; (2) unlawful boycott and unlawful exclusive dealing under Section 1 of the Sherman Act, Section 3 of the Clayton Act, and the Minnesota Antitrust Act, Minn. Stat. §§ 325D.51, 325D.53; and (3) false advertising under the Lanham Act and the MDTPA.

In short, Insignia contends that NAMI purchased the right from retailers to exclude competitors like Insignia and FGI from offering their own services to retail stores.  Insignia claims that NAMI paid increasingly large sums to retailers in exchange for retail exclusivity contracts that were excessively long, (Overstreet Am. Rebuttal Report, Docket No. 516, Ex. 6 at 20), and those contracts offered NAMI increasing exclusivity in placing promotional tactics in retail stores.  Insignia contends that as a consequence of NAMI's overwhelming presence in retail stores, NAMI can charge CPGs more for its advertising tactics because NAMI can assure CPGs that only their products will be advertised in stores.  Insignia asserts that in an effort to enforce those exclusive contracts, NAMI directed its own employees or retail store employees to remove from retail store shelves properly implemented advertising tactics from NAMI competitors.

---

[1] Insignia brought fourteen claims in its Amended Complaint, but the parties stipulated to the dismissal of defendant Albertson's from the case, and claims four and ten are therefore no longer at issue.  (Docket No. 383.)

Insignia further contends that NAMI sought to bolster the exclusionary effects of its contracts with retailers by falsely claiming that NAMI's competitors' compliance rates were substantially lower than NAMI's.

NAMI now moves for summary judgment, arguing that Insignia has failed to produce evidence establishing that NAMI's conduct caused either injury to Insignia or antitrust injury. Further, NAMI contends that Insignia failed to establish claims for unlawful monopoly or attempted monopoly and for unlawful exclusive dealing or unlawful boycott. The Court begins by addressing the merits of Insignia's anti-trust claims, and then turns to Insignia's disparagement claims.

## B.    Injury to Insignia

A plaintiff seeking damages under antitrust laws must show that the alleged anticompetitive practices in fact caused it injury. *See* 15 U.S.C. § 15(a). That is, "[i]n order to prevail plaintiffs must prove for each claim . . . a causal relationship between the violation and the injury." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1054 (8th Cir. 2000) (internal quotation marks omitted); *see also Read v. Med. X-Ray Ctr., P.C.*, 110 F.3d 543, 545 (8th Cir. 1997) (holding at summary judgment that the plaintiff "had to show a reasonable jury could find [the defendant's] allegedly anticompetitive conduct was 'a material cause' of [plaintiff's] injury").

### 1.    Evidence of Loss of Business

NAMI contends that Insignia has not produced evidence that CPGs reduced business, ceased doing business, or declined to do business with Insignia as a result of

NAMI's conduct.  Insignia responds that it has produced evidence that the distribution of audit results caused CPGs to reconsider their contracts with Insignia and that NAMI's exclusive contracts and aggressive enforcement of those contracts caused Insignia to suffer injury.

Insignia's evidence of injury comes primarily from the declarations of Pamela Wesson, a CPG employee, and Karl Ball, an Insignia National Account Executive.  In her declaration, Wesson states:

> During a routine sales call, . . . a NAM sales representative[] informed me that NAM was the exclusive provider of in-store advertising with a number of large retail store chains whose stores sold Sara Lee brands.  [The sales representative] told me that as the exclusive provider, NAM personnel were authorized to take down competitors' signs, including Insignia POPSigns, from the shelves of these stores.  She indicated that Sara Lee would be throwing its money away on Insignia POPSigns because they were very likely to be removed by NAM personnel and thus would be ineffective in promoting Sara Lee brands. . . . Because of [the sales representative's] statements to me about NAM removing competitors' signs from store shelves and Insignia's poor compliance, I could not risk continuing to recommend Insignia's programs to Sara Lee's brand team.

(Decl. of Pamela Wesson, Docket No. 516, Ex. 20, ¶¶ 10-11.)

Further, Karl Ball states that despite Insignia's progress in securing the business of Procter & Gamble ("P&G") in the 2001-2002 time period, that progress "ceased shortly after NAM's campaign attacking Insignia's compliance began.  Anita Scharfenbarger – P&G's Manager, Marketing Operations – told me that P&G personnel had received copies of a letter circulated by NAM's President, Dominick Porco, falsely asserting that Insignia's compliance rates were in the 20% range." (Decl. of Karl Ball, Docket No. 516, Ex. 58, ¶¶ 7-8.)   Ball states that Scharfenbarger told him that a NAMI representative

informed her that NAMI personnel were instructed to take down Insignia signs if they saw them on the shelf. (*Id.* ¶ 10.)  Ball also notes that P&G pared back its business relationship with Insignia after receiving the Porco Letter and that he had similar experiences with two other major CPGs.  (*Id.* ¶¶ 12-14, 15-18.)

NAMI asks the Court to exclude these declarations from consideration, and also to exclude the declaration of Richard Rodriguez, who states that he witnessed two incidents in which "someone had improperly removed an Insignia POPSign product" from retail store shelves.  (Decl. of Richard Rodriguez, Docket No. 516, Ex. 66, ¶¶ 2-4.)  In particular, NAMI argues that Insignia did not properly identify the declarants as required under Rule 26 of the Federal Rules of Civil Procedure.

Rule 37 provides for the exclusion of evidence "on a motion, at a hearing, or at a trial" if such evidence was not timely disclosed, "unless the failure [to disclose] was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  The Court considers four factors to determine whether exclusion is warranted: "(1) the importance of the excluded material; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the material to be used . . . , and (4) the availability of a continuance to cure such prejudice."  *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1063 (D. Minn. 1999), *vacated in part on other grounds*, 290 F.3d 1364, 1380 (Fed. Cir. 2002) (internal quotation marks omitted).  NAMI argues that all three declarations should be excluded because NAMI has not had an opportunity to test the basis for their assertions through normal discovery process, and that there is no justification for failing to timely disclose the individuals.

NAMI also contends that the Ball declaration should be excluded because it is based on hearsay.  Insignia responds that the declarations should not be excluded because NAMI has not established that Insignia acted in bad faith.

As an initial matter, NAMI does not identify which of Ball's statements constitute hearsay.  Although the Court notes that Ball's references to discussions with the P&G manager could conceivably be considered hearsay, and therefore could be inadmissible, the Court defers decision on that consideration until trial.  Even assuming that **some** of Ball's statements could be inadmissible, his affidavit nonetheless contains substantial admissible evidence of Insignia's injury entitling Insignia to survive summary judgment. *Cf. Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) (noting, in the context of evaluating the existence of evidence of a conspiracy under Section 1 of the Sherman Act, that "**[w]ithout a showing that admissible evidence will be available at trial**, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment" (emphasis added)).  The Court may therefore address the admissibility of Ball's statements in motions *in limine* prior to trial.

Further, NAMI has failed to establish that Insignia acted in bad faith.  Generally, "[t]he use of an undisclosed witness should seldom be barred unless bad faith is involved." *Bergfeld v. Unimin Corp.*, 319 F.3d 350, 355 (8th Cir. 2003) (internal quotation marks omitted); *see also Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir. 1993).  Insignia amended its Rule 26 Disclosures on January 9, 2009 – without objection by NAMI – to include Wesson and Rodriguez.  (*See* Am. Disclosures, Docket No. 526, Ex. B, at 29, 34.)  Further, NAMI should have been aware of the import of the import of

Ball's testimony. An agreement between NAMI and Insignia identified Ball as an individual whose electronically stored information was to be searched. Indeed, Insignia represents that it produced 12,495 documents for which Ball was a custodian. In addition, discovery revealed to NAMI that Ball was the Insignia sales representative for the CPG accounts to which he testifies.

In sum, NAMI has not established that Insignia acted in bad faith or that NAMI will suffer prejudice if the declarations are not excluded. Moreover, the declarations provide important evidence in support of Insignia's claim that it has suffered injury-in-fact. In light of these circumstances, the Court denies NAMI's motion to exclude the declarations. The Court notes, however, that in granting the motion to compel *infra*, the Court expressly provides for a brief extension of time for discovery for NAMI to address the substance of the declarations through deposition testimony or otherwise.

### 2.    Dr. Overstreet's Damages Model

NAMI also challenges the damages model of Insignia's expert, Dr. Thomas Overstreet, who concludes that NAMI's conduct, and in particular the Porco Letter, caused Insignia's stock price to drop. Specifically, NAMI argues that there is no evidence that investors ever knew about the Porco Letter or sold their Insignia stock in response to the Porco Letter. NAMI also contends that Dr. Overstreet failed to disaggregate other non-antitrust factors that could have caused Insignia's stock price to drop. According to NAMI, Dr. Overstreet's event study is unreliable and should be excluded, and therefore Insignia has not produced evidence of injury-in-fact.

A plaintiff may not recover for losses that are not caused by the defendant's unlawful conduct. *See Amerinet Inc. v. Xerox Corp.*, 972 F.2d 1483, 1493-94 (8th Cir. 1992). That is, a plaintiff must disaggregate losses caused by the defendant's unlawful conduct from losses caused by other factors:

> When a plaintiff improperly attributes all losses to a defendant's illegal acts, despite the presence of significant other factors, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage. This is precisely the type of "speculation or guesswork" not permitted for antitrust jury verdicts.

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1162 (7th Cir. 1983).

NAMI contends that Dr. Overstreet's damages estimates are inadmissible because they fail to disaggregate losses caused by NAMI's alleged conduct and losses caused by Insignia's business decisions. NAMI describes several factors for which Dr. Overstreet should have accounted for in his damages assessment: the higher prices for Insignia's POPSigns as compared with NAMI's Price Pops, and the consequent loss sales; Insignia's failed acquisition of another TPP, Valustix; Insignia's competitive disadvantage of not having a field force to install tactics; managerial and strategic errors identified in management consulting reports; and Insignia's delay in entering a joint venture with another advertising company, Valassis. Insignia responds that Dr. Overstreet's report was based on two reliable methods for calculating damages, and further contends that Dr. Overstreet gave proper weight to all factors that NAMI contends were ignored in arriving at damages calculations.

The Court also notes that NAMI's motion *in limine* to exclude Dr. Overstreet's testimony also raises these damages contentions. (*See* Docket No. 488.) The Court

deferred decision on that and two other motions *in limine* filed by NAMI until after the Court decides the instant motions.[2]  Thus, the Court only briefly addresses the substance of NAMI's arguments here.

The Court agrees with Insignia that, at a minimum, Dr. Overstreet's damages calculations are adequate to survive summary judgment.  "A plaintiff must first prove the fact of antitrust damages, some 'element of actual damages caused by the defendant's violation of the antitrust laws.'"  *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206 (5th Cir. 2000) (quoting *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 989 (5th Cir. 1983)).  If a plaintiff does so, "a more relaxed burden of proof obtains for the amount of damages than would justify an award in other civil cases."  *Id.* at 207.  "While the two most common methods of quantifying antitrust damages are the 'before and after' and 'yardstick' measures of lost profits," a plaintiff may prove damages through an alternative method that provides a "reasonable estimate" based on "relevant data."  *Id.*  Here, Insignia contends that Dr. Overstreet used two methods to calculate damages, including the yardstick method and a but-for method relying on costs and revenue projections[3] in the but-for world – at the summary judgment stage, the Court concludes that these methods are sufficient for establishing damages.  Moreover, there is

---

[2]  On August 10, 2009, NAMI withdrew its motions *in limine* pending the Court's decision here and in anticipation of a future scheduling order.

[3]  NAMI seeks to exclude these damage estimates as provided by Insignia management. The Court finds, however, that the motion to exclude damages estimates is more properly considered in a motion *in limine* regarding Dr. Overstreet's expert opinion.  Accordingly, the motion is denied without prejudice to the extent it seeks to exclude the damages estimates that form the basis for Dr. Overstreet's opinion.

adequate evidence, in the context of summary judgment, that Dr. Overstreet either accounted for, or found irrelevant, the factors NAMI contends he ignores.  (Overstreet Report, Docket No. 516, Ex. 3 at 117; Overstreet Am. Rebuttal Report, Docket No. 516, Ex. 6 at 31-34.)

The Court will more fully address NAMI's arguments after setting a briefing schedule on the motions *in limine*.

### 3.   Damages Prior to November 14, 2002

NAMI also contends that Insignia may not recover any losses caused by NAMI conduct that occurred prior to November 14, 2002, because the parties entered into a settlement agreement releasing NAMI from liability for losses prior to that date. Dr. Overstreet's damages calculations, according to NAMI, includes estimates of losses before that date.  Although it is not clear that Dr. Overstreet's damages estimates did, in fact, consider losses prior to the release date, it would at least appear that any damages NAMI caused before November 14, 2002, cannot be recovered in this action.  As with the arguments regarding Dr. Overstreet's methodology, the Court will address the question of pre-2003 damages, if it remains an issue, before trial.

### C.   Antitrust Injury

NAMI further contends that it is entitled to summary judgment because Insignia has not established that it suffered antitrust injury.  In antitrust cases, "[p]laintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury

should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Thus, Insignia must establish that any alleged injury flowed from a harm to competition. *See Read*, 110 F.3d at 545. "[I]f there is no showing of injury, or if the injury alleged or proven is not an 'antitrust injury,' the plaintiff does not have a claim cognizable under the antitrust laws." *Midwest Commc'ns v. Minnesota Twins, Inc.*, 779 F.2d 444, 450 (8th Cir. 1985).

NAMI argues that its conduct has not harmed in-store competition because the evidence shows that its conduct has not adversely affected price or output in in-store advertising, and that it has not excluded competition. NAMI asserts that instead, between 2000 and 2007, NAMI's average CPG in-store placement prices dropped by 35 percent.[4] (Murphy Report, Docket No. 476, Ex. 1 at 22-23, and Ex. 12.) NAMI also asserts that its payments to retailers for the right to place tactics in retail stores have also increased substantially, growing from approximately $44 million in 2002 to approximately $82 million in 2005. (*Id.*) NAMI also points to evidence that in-store advertising output has expanded and new advertising media are emerging in the market. (Overstreet Report, Docket No. 516, Ex. 3 at 30-36; Murphy Report, Docket No. 476, Ex. 1, at Ex. 1.) Finally, NAMI contends that Insignia has not produced evidence that NAMI's alleged disparagement caused injury to competition.

---

[4] During the same time period, NAMI claims that its in-store retail placements increased substantially and that revenue generated from sales to CPGs have increased from approximately $224 million to approximately $378 million. (Murphy Report, Docket No. 476, Ex. 1 at Ex. 2.)

Insignia responds that it has produced evidence demonstrating a dispute of fact that NAMI's conduct injured in-store competition.  First, Insignia argues that the very purpose of NAMI's exclusive contracts was to exclude competitors.  (Overstreet Dep. Tr., Docket No. 516, Ex. 51 at 176-77.)  Insignia argues that the exclusive contracts, for example, exclude NAMI's competitors from contracting with a large percentage retailers, as computed by a measure of all commodity volume ("ACV"), or the measure of total annual sales volume for retailers.  (Overstreet Report, Docket No. 516, Ex. 3, tbl.4.) Moreover, Insignia argues that NAMI's right-of-first-refusal provision in retail contracts, which allows NAMI to offer its own product in place of any new product offered by a rival, further precludes competitors from entering the market.  (Overstreet Report, Docket No. 516, Ex. 3 at 74.)

In addition, Insignia contends that NAMI's "compliance campaign" was designed to eliminate competition from its two largest in-store, at-shelf competitors: Insignia and FGI.  In support, Insignia produces evidence that both it and FGI lost revenue and clients as a consequence of NAMI's conduct.  (*See, e.g.*, Decl. of Pamela Wesson, Docket No. 516, Ex. 20, ¶¶ 10-11; Willis Dep. Tr., July 25, 2007, Docket No. 516, Ex. 64 at 24-25, 81.)   Dr. Overstreet also notes that "disparagement will amplify the adverse impact of the exclusive contracts on rivals' ability to compete" because a reduction in demand for a rival's services increases the rival's costs of expansion.  (Overstreet Report, Docket No. 516, Ex. 3 at 69.)   Dr. Overstreet notes that the disparagement also reduces the competitive effectiveness of NAMI's rivals.  (*Id.* at 91.)

Insignia has produced adequate evidence of antitrust injury to survive a motion for summary judgment. Here, the Court considers whether there is evidence that NAMI's exclusive retailer contracts and alleged disparagement caused harm to in-store competition. Although NAMI has certainly raised ample evidence that there was no injury to competition, Insignia has countered with contrary evidence. Under those circumstances, summary judgment is unwarranted.

NAMI also contends that its contracts with retailers are procompetitive, and asserts that Insignia has not established that NAMI's competitors have been foreclosed from competing. The Court considers those contentions *infra* in its analysis of Insignia's unlawful boycott and unlawful exclusive dealing claims.

**D.    Monopoly and Attempted Monopoly**

Section 2 of the Sherman Act provides that it is illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish a claim for unlawful monopolization under Section 2 of the Sherman Act or its Minnesota counterpart, Minn. Stat. § 325D.52, a plaintiff must demonstrate that the defendant "(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1490 (8th Cir. 1992) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)); *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 556-58 (Minn. Ct. App. 2001).

NAMI argues that there is no evidence that it possesses monopoly power over CPG customers or monopsony power over retailers.   Further, NAMI contends that Insignia's proposed relevant market is not economically coherent and, regardless, that Insignia has not demonstrated that NAMI possesses a dominant share of any market. NAMI also argues that Insignia's disparagement claims cannot establish exclusionary action under antitrust law.   The Court first addresses the question of NAMI's market power in the relevant market.

### 1.    Monopoly Power

Under Section 2, the plaintiff must demonstrate that the defendant possessed monopoly or monopsony power in the relevant market.   *See Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 691 (8th Cir. 1993).   Monopoly power is the power of a seller "to control prices or exclude competition."   *United States v. E.I. du Pont De Nemours & Co.*, 351 U.S. 377, 391 (1956).   Monopsony power is the power of a buyer to reduce prices below a level at which its rivals may compete.   *See* I ABA Section of Antitrust Law, Antitrust Law Developments 288-89 (6th ed. 2007).

A plaintiff may establish monopoly power in two ways.[5]   *See Flegel*, 4 F.3d at 691.   First, the plaintiff may present direct evidence of monopoly power by "showing the exercise of actual control over prices or the actual exclusion of competitors."   *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) (quoting *Byars v. Bluff*

---

[5] The Court addresses evidence of NAMI's monopsony power over retailers *infra*.

*City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979)) (internal quotation marks omitted). Second, a plaintiff may present "circumstantial evidence of monopoly power by showing a high market share within a defined market." *Id.*; *see also HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 547 (8th Cir. 2007). "In recent years, parties and courts have increasingly moved toward utilizing the circumstantial method as a 'shortcut.'" *Realty One*, 173 F.3d at 1016; *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 464 (1992).

Here, the parties extensively argue whether there is evidence that NAMI actually controls prices or actually excludes competitors. The Court, however, finds below that there is a material fact dispute regarding the relevant market and NAMI's market share within that market, and it therefore does not address the parties' direct evidence arguments at summary judgment.[6]

### a.    The Relevant Market

"Antitrust claims often rise or fall on the definition of the relevant market." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995). "The relevant market has two components – a product market and a geographic market." *HDC*, 474 F.3d at 547. Here, the parties only dispute how to define the relevant product market.

---

[6] Although NAMI has presented substantial evidence that it does not control prices, the Court agrees with Insignia for the purposes of summary judgment that there is adequate direct evidence that NAMI's exclusive retail contracts actually exclude competitors. Regardless, the Court need not further assess the sufficiency of the direct evidence, as there is at least a fact dispute concerning circumstantial evidence of NAMI's monopoly power in the relevant market.

"The relevant product market is a question of fact, which the plaintiff bears the burden of proving."[7]   *Id.*   "The boundaries of the product market can be determined by the reasonable interchangeability or cross-elasticity of demand between the product itself and possible substitutes for it."   *Id.*   The product market can be determined by analyzing how "consumers will shift from one product to the other in response to changes in their relative costs."   *SuperTurf, Inc. v. Monsanto Co.*, 660 F.2d 1275, 1278 (8th Cir. 1981). "To conduct this inquiry, the courts must weigh several factors including, industry or public recognition of the products as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."   *HDC*, 474 F.3d at 547.

Insignia asserts that the relevant market is the "third-party at-shelf in-store advertising" market.[8]   According to Insignia, those three factors – advertising that is in-store, shelf-based, and provided by a third party – demonstrate unique functions and uses that cannot be achieved through the use of substitute products.   Specifically, Insignia introduces evidence that in-store, point-of-purchase advertising is distinct from out-of-

---

[7] However, "[l]ike any other issue, market definition is subject to summary judgment if the plaintiffs fail to provide sufficient evidence from which a jury could reasonably find in their favor." *Flegel*, 4 F.3d at 690.

[8] NAMI contends that this market definition should be rejected because it was not alleged in the Amended Complaint.   The Court disagrees.   NAMI cites *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105-06 (2d Cir. 2002), in support of its contention, but *PepsiCo* did not turn on the plaintiff's "narrowing" of its definition of the relevant market at summary judgment.   Rather, the district court rejected the definition because "it was not substantiated by the evidence; and . . . it was not supported by the practical indicia enunciated in [Supreme Court precedent]," and the appellate court affirmed on those bases.   *Id.* at 105-07.

store advertising.  For example, the industry considers out-of-store free standing inserts to be mass, untargeted advertising vehicles.  (*See* Morris Dep., Docket No. 516, Ex. 82 at 44:4-8.)   In-store advertising is distinct, Insignia argues, because it is a "significant decision influencer" and "shoppers . . . are far more likely to make an in-store decision to purchase a product that has [point-of-purchase] support than a product that does not." (POPAI Consumer Buying Habits Study, Docket No. 516, Ex. 81 at IS07-176863.) Insignia also notes that at-shelf products can be distinguished even from other in-store products like checkout coupons because the "three to seven seconds when someone notices an item on a store shelf" is "the first moment of truth" and "one of [the] most important marketing opportunities" for a manufacturer.  (At The In-Store Tipping Point, Docket No. 85 at NA07-2063424.)   Finally, Insignia notes that the relevant market is properly limited to third-party vendors.  In particular, Insignia notes that CPGs consider TPPs to be a distinct avenue for advertising because they provide access to retailer networks and offer technical printing, graphics, and distribution capabilities.  (*See* Overstreet Report, Docket No. 516, Ex. 3 at 41, 97; Wilkolak Tr., July 2, 2008, Ex. 83 at 48:1-51:7.)

NAMI counters that the relevant market should be defined as "all in-store advertising."   NAMI further claims that its share of that market is only 10%, which NAMI argues is insufficient as a matter of law to support a Section 2 claim.  NAMI also asserts that Insignia's proposed relevant market is unsupported by the facts.  First, NAMI argues that the "third-party" and "in-store" limitations too narrowly define the market, as CPGs finance both in-store and out-of-store advertising with retailers and third parties

from a single promotions budget.  (Drill Dep. Tr., Docket No. 476, Ex. 8 at 105-06;

Overstreet Dep. Tr., Docket No. 476, Ex. 6 at 435-37.)   In addition, NAMI cites a

Seventh Circuit case, *Menasha Corp. v. News America Marketing In-Store, Inc.*, 354 F.3d

661 (7th Cir. 2004), for the proposition that there is no market for in-store advertising.  In

that case, the Seventh Circuit addressed whether the plaintiffs presented adequate

evidence to support an argument that the relevant market for antitrust purposes was

defined as "at-shelf coupon dispensers."  *Id.* at 661.  The Seventh Circuit affirmed the

district court's grant of summary judgment in favor of the defendants on the basis that

"no reasonable juror could find that producing a large share of at-shelf coupon dispensers

confers market power."  *Id.* at 662.  In particular, the Seventh Circuit held that "[t]he

number of ways to promote a product is large, and even a stranglehold over at-shelf

coupon dispensers would affect only a tiny portion of these means."  *Id.* at 664.  NAMI

argues that Insignia's proposed market must similarly fail.

Here, both parties have brought forth evidence supporting their proposed relevant

markets and, given that the facts defining the relevant market are disputed, summary

judgment is inappropriate.   Although *Menasha* dealt with somewhat similar

circumstances, the district court in that case had determined that the plaintiff had not

come forth with sufficient evidence supporting its proposed relevant market.  *Menasha*

*Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1029-30 (N.D. Ill. 2003).

In contrast, Insignia has brought forth substantial evidence highlighting the claimed

unique nature of an in-store, at-shelf, third-party advertising market.  *See Brown Shoe Co.*

*v. United States*, 370 U.S. 294, 325 (1962) (stating that within broader markets,

submarkets may exist for antitrust purposes and that those submarkets "may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors").

In addition, the Court does not find that Insignia has attempted to "define the elements of the relevant market to suit its desire for high [competitor] market share, rather than letting the market define itself." *PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000). Rather, Insignia has carefully delineated the import of point-of-purchase advertising, as contrasted with out-of-store advertising. In short, there is at least a fact question regarding whether Insignia's proposed relevant market excludes advertising tactics or methods that are "reasonably interchangeable by consumers for the same purposes." *See E.I. du Pont*, 351 U.S. at 395.

The Court also notes that the mere fact that a CPG has a single promotions budget for all of its advertising – in-store or out-of-store, with retailers or third parties – is insufficient to support a holding as a matter of law that the relevant market must be defined as "in-store advertising." When defining an antitrust product market, "[t]he circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn." *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31 (1953). In the context of this dispute, the Court cannot find as a matter of law that CPGs would necessarily turn to checkout coupons or other forms of in-store advertising in the absence of the availability of at-shelf

advertising.  *Cf. Nat'l Collegiate Athletic Ass'n v. Bd. of Regents*, 468 U.S. 85, 111 (1984) ("[I]ntercollegiate football telecasts generate an audience uniquely attractive to advertisers and . . . competitors are unable to offer programming that can attract a similar audience.  These findings amply support [the court's] conclusion that the NCAA possesses market power." (footnote omitted)).

Because a material fact dispute remains regarding the definition of the relevant market, the Court turns to the consideration of whether Insignia has at least adduced evidence indicating that NAMI has a dominant share of the market as Insignia has defined it.

### b.     Market Power

NAMI contends that it is entitled to summary judgment because Insignia has not calculated NAMI's share of the relevant market.  In particular, NAMI attacks Insignia's calculation of NAMI's share in certain local regions.  NAMI argues that the ACV calculation ignores the fact that Insignia and other competitors are present in many of those retailers and that Insignia's 90 percent share of at-shelf signage sales dwarfs NAMI's.

In these circumstances, however, given that Insignia's expert has provided information relating to NAMI's share of the relevant market amongst other TPPS, and has shown that share to be substantial for the relevant time period, (Overstreet Report, Docket No. 476, Ex. 3, tbl.2, tbl.22), summary judgment is unwarranted.

## 2.    Willful Acquisition or Maintenance of Monopoly Power

As an initial matter, NAMI does not dispute that it enters into exclusive contracts with retailers to be the sole provider of certain advertising tactics for the duration of that contract.  Given the Court's finding that Insignia has at least produced evidence that NAMI has market power in the relevant market, the Court concludes that evidence of NAMI's exclusive contracts with retailers adequately raises a fact issue about whether NAMI's conduct excluded competition in an effort to acquire or maintain monopoly power.

NAMI contends, however, that Insignia's disparagement claims cannot establish any purposeful action on NAMI's part to maintain monopoly power because "[c]ommercial speech is not actionable under the antitrust laws."  *See Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 624 (7th Cir. 2005).  NAMI cites a Seventh Circuit opinion for the proposition that "[a]ntitrust law condemns practices that drive up prices by curtailing output."  *Id.* at 623.  "False statements about a rival's goods do not curtail output in either the short or the long run.  They just set the stage for competition in a different venue: the advertising market."  *Id.*   As a consequence, NAMI asserts that the Porco Letter and related representations to CPGs about Insignia compliance rates cannot constitute anticompetitive conduct.

Insignia responds that the applicable standard is found in the Eighth Circuit case, *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980).  In *International Travel Arrangers*, a plaintiff-airline alleged that the defendant airline, a competitor, violated Sections 1 and 2 of the Sherman Act by employing an ad

campaign falsely claiming that the plaintiff's air service to Hawaii from the Twin Cities was unreliable.  *See id.* at 1262-63.  The Eighth Circuit affirmed the district court's award of judgment and treble damages in the plaintiff's favor, finding that the use of false advertising constituted willful maintenance of monopoly power in violation of Section 2. *Id.* at 1270-72.  In particular, the plaintiff had alleged that the defendant's statements caused harm to competition because the defendant made the statements with the intent to prevent the plaintiff from becoming a competitive threat.  *Id.* at 1257-58.

Generally, case law supports the proposition that a defendant's false or disparaging statements do not cause injury to competition, and are therefore not actionable under antitrust law.  *See Fair Isaac Corp. v. Experian Info. Solutions Inc.*, ___ F. Supp. 2d ___, Civ. No. 06-4112, 2009 WL 2252583, at *14 (D. Minn. July 24, 2009).  As noted by the Court in *Fair Isaac Corp. v. Experian Information Solutions Inc.*, however, the Eighth Circuit's decision in *International Travel Arrangers* describes circumstances in which false or disparaging statements are actionable under antitrust law. *Id.* at *15.

The Court finds that the circumstances in *International Travel Arrangers* are similar to the instant case.  Here, Insignia produces evidence that NAMI distributed the compliance-rate audit results with the intent to eliminate competition.  A rational trier of fact could conclude that NAMI's allegedly false and misleading representations about Insignia and FGI in the Porco letter and in statements by NAMI sales representatives "contributed to the willful maintenance" of NAMI's alleged monopoly power by preventing Insignia, FGI, and other competitors mentioned in the audit from being a

competitive threat to NAMI.  *See Int'l Travel Arrangers*, 623 F.2d at 1270.  The Court notes that *International Travel Arrangers* may be distinguishable on its facts because the defendant in that case was an established market competitor that directed disparaging comments at a new entrant to the market.  The Court finds, however, that because there is sufficient evidence NAMI had relatively few competitors in Insignia's proposed market, NAMI's alleged misrepresentation of those competitors' compliance rates could cause harm to competition.  Accordingly, NAMI's allegedly disparaging statements may establish a claim under Section 2 of the Sherman Act.

### 3.   Monopsony Power over Retailers

The Court concludes, however, that NAMI is entitled to summary judgment on the question of monopsony power over retailers.  "Monopsony power is market power on the buy side of the market.  As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) (citation omitted).  Here, the Court agrees with NAMI that Insignia has not demonstrated that NAMI has monopsony power over retailers.   Indeed, Insignia's expert, Dr. Overstreet, indicated that he did not believe that NAMI had monopsony power, (Overstreet Dep. Tr., Docket No. 476, Ex. 6 at 266-67), and summary judgment must be granted as to Insignia's monopsony claims.  *See Weyerhaeuser*, 549 U.S. at 317-324.

### 4.      Attempted Monopoly

To prevail on a claim of attempted unlawful monopolization, Insignia must prove "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 801 (8th Cir. 1987).  "The specific intent element requires proof that the defendant intended his acts to produce monopoly power"; that is, that the defendant intended "to control prices or to restrain competition unreasonably." *Id.*

As an initial matter, the parties do not appear to substantively address the merits of Insignia's attempted monopoly claims, but rather focus on the question of whether Insignia established a claim for monopoly.  Regardless, for the reasons discussed *supra*, Insignia has adduced sufficient evidence that NAMI intended to damage competition and that NAMI engaged in anticompetitive conduct by entering into exclusive dealing arrangements with retailers and disseminating allegedly disparaging reports about its competitors' compliance rates.  (*See generally* Insignia Mem. in Opp'n to Mot. for Summ. J., Docket No. 515 at 33-35.)  The Court concludes that there is sufficient evidence indicating that NAMI had a dangerous possibility of success: retailers were concerned about breaching exclusive contracts with NAMI, and retailers were withdrawing support for Insignia POPSigns based on alleged compliance issues.  Accordingly, the Court denies NAMI's motion to the extent it addresses Insignia's

attempted monopoly claims under Section 2 of the Sherman Act and Minnesota Statute § 325.D52.

### E.    Unlawful Exclusive Dealing and Unlawful Boycott

To establish a claim under Section 1 of the Sherman Act,[9] Section 3 of the Clayton Act, or Minnesota Statute §§ 325D.51 and 325D.53, a plaintiff must demonstrate "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a *per se* rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce." *See Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 5 F. Supp. 2d 694, 703 (D. Minn. 1998) (Sherman Act § 1); *see also Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1142-43 & n.2 (D. Minn. 1999) (analyzing claims under Section 3 of the Clayton Act and the Section 1 of the Sherman Act together); *Howard*, 636 N.W.2d at 557 (stating that Section 1 of the Sherman Act is analogous to Minnesota Statutes §§ 325D.51 and 325D.53).

### 1.    Contract, Combination, or Conspiracy

"The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that [the defendant] and others had a conscious commitment to

---

[9] Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.

a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

To demonstrate a contract, combination, or conspiracy under Section 1 of the Sherman Act or Section 3 of the Clayton Act, a party need only show that there was concerted, as opposed to unilateral, action. *Minn. Ass'n of Nurse Anesthetists*, 5 F. Supp. 2d at 703. Here, NAMI concedes that it entered into contracts with retailers for retail exclusivity, which is sufficient to establish a contract or conspiracy for the purposes of Insignia's exclusive dealing claims. *See Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 660-61 (8th Cir. 2000) (examining sole-source or exclusive dealing contracts under the rule of reason). Insignia contends that the practical effect of NAMI's exclusive agreements with retailers is that "when a CPG buys an in-store advertising product from NAM, NAM's retailer exclusivity will prevent that CPG from purchasing a competing product from Insignia or FLOORgraphics." (Insignia's Mem. in Opp'n to Mot. for Summ. J., Docket No. 515 at 27.)

Here, NAMI does not distinguish the evidence necessary to establish a conspiracy for unlawful exclusive dealing from the evidence necessary to establish a conspiracy for unlawful boycott. Indeed, NAMI only states in its memorandum in support of its motion: "There is no evidence of unlawful conspiracy between News America and any retailer or group of retailers . . . ." (Mem. in Supp. of Mot. for Summ. J., Docket No. 473 at 37.) NAMI then cites case law, and proceeds to conclude, "Insignia has presented no evidence that News America engaged in the alleged conduct or that any such conduct was not unilateral." (*Id.* at 38.) Regardless, in addition to finding that Insignia may survive

summary judgment on its claims relating to unlawful exclusive dealing, the Court finds Insignia has adduced adequate circumstantial evidence of a concerted agreement among NAMI and retailers.  (Insignia Mem. in Opp'n to Mot. for Summ. J., Docket No. 515 at 23-25 (describing circumstantial evidence).)

## 2.      Unreasonable Restraint on Trade and the Rule of Reason

"Exclusive dealing contracts are analyzed under the rule of reason."  *Minn. Ass'n of Nurse Anesthetists*, 208 F.3d at 660.  When assessing the legality of a restraint on trade under the rule of reason, the Court focuses on whether the defendant's conduct had detrimental effects on competition.  *Flegel*, 4 F.3d at 680; *see also Eastman Kodak*, 504 U.S. at 467 (noting that a court's rule of reason analysis focuses on the "particular facts disclosed by the record") (internal quotation marks omitted).   A plaintiff may demonstrate detrimental effects in two ways: by delineating "a relevant market and show[ing] that the defendant has enough market power to significantly impinge on competition" or by demonstrating "that the challenged practice has actually produced significant anti-competitive effects."  *Minn. Ass'n Nurse Anesthetists*, 5 F. Supp. 2d at 706-07; *see also F.T.C. v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." (internal quotation marks omitted)).

"Either showing – market power or actual detrimental effects – shifts the burden to the defendant to demonstrate pro-competitive effects." *Flegel,* 4 F.3d at 688. "If the defendant satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that any legitimate objectives could be achieved through substantially less restrictive means." *Minn. Ass'n Nurse Anesthetists*, 5 F. Supp. 2d at 707. "The court then weighs the benefits and detriments to determine if the conduct is reasonable on balance." *Id.* (internal quotation marks omitted).

As discussed *supra*, there is a factual dispute regarding NAMI's market power in the relevant market. Under this analysis, the burden therefore shifts to NAMI to demonstrate procompetitive effects of the exclusive contracts.

NAMI argues that its exclusive contracts are procompetitive and therefore do not harm competition. Specifically, NAMI asserts that CPGs benefit from retail exclusivity because CPGs can ensure that, by contracting with TPPs that have exclusivity contracts with retailers, only the CPG's product is promoted by a particular advertising tactic at a specific time in retail stores. (Simcox Dep. Tr., Docket No. 476, Ex. 9 at 32.) NAMI also argues that retailers benefit from retail exclusivity because it reduces clutter in their stores and creates administrative efficiencies by requiring the retailer to deal with only one provider. (Kroger Dep. Tr., Docket No. 476, Ex. 20 at 154.) Further, NAMI notes that entering into exclusive contracts with retailers is a standard and accepted industry practice, and that NAMI's exclusive contracts comport with that practice. (*See* Overstreet Dep. Tr., Docket No. 476 Ex. 6 at 271-72 (noting that FGI also has exclusive contracts with retailers)); *see also Trace X Chem., Inc. v. Canadian Indus., Ltd.*, 738 F.2d

261, 266 (8th Cir. 1984) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct[.]").

Insignia argues, however, that the procompetitive benefits of the exclusive contracts are outweighed by the harm to competition. That is, Insignia claims that "the competition foreclosed by the contract . . . constitute[s] a substantial share of the relevant market." *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961).

NAMI argues that Insignia has not established that NAMI's competitors have been foreclosed from competing. NAMI argues that Insignia still competes against NAMI and wins business; that Insignia is able to place in-store tactics at stores that have "carve-out" provisions in their NAMI contracts; that Insignia may compete for retailers with which NAMI does not have contracts; and that Insignia remains free to compete for business with non-grocery retailers. Moreover, NAMI asserts that it is undisputed Insignia accounted for 90 percent of revenue generated in 2007 from sales of price signs like POPSigns and Price POPS. (Murphy Report, Docket No. 476, Ex. 1, at Ex. 3.) Finally, NAMI contends that Insignia's calculations of foreclosure percentages, which are based on ACV, are misleading because ACV fails to account for situations in which both NAMI and Insignia do business in the same retail store.

"The principle [sic] criteria used to evaluate the reasonableness of a contractual arrangement include the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers." *Concord Boat*, 207 F.3d at 1059. As the Third Circuit has noted, "[t]he test is not total foreclosure, but whether the challenged practices bar a substantial number

of rivals or severely restrict the market's ambit." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005).

Here, Insignia's evidence that it and other competitors have been foreclosed is sufficient to survive summary judgment.   Insignia points to evidence indicating that NAMI's primary competitors, Insignia and FGI, are foreclosed from a substantial share of the relevant market.   "Generally speaking, a foreclosure rate of at least 30 percent to 40 percent must be found to support a violation of the antitrust laws." *Minn. Mining & Mfg.*, 35 F. Supp. 2d at 1143.   Insignia contends that, as a function of ACV, NAMI's retailer contracts foreclose competitors' abilities to contract with retailers in up to 90 percent of grocery store opportunities in Tampa, Florida; 80 percent of grocery store opportunities in the Washington D.C. and Baltimore areas; and almost two-thirds of grocery store opportunities in Boston, Charlotte, Dallas, Los Angeles, New York, and Philadelphia.  (Overstreet Rep. Docket No. 516, Ex. 3, tbl.16.)  Insignia further asserts that NAMI's annual revenue for placements of in-store products account for 90 percent of the volume of sales by parties that offer similar products on a national scale. (Overstreet Am. Rebuttal Report, Docket No. 516, Ex. 6, tbl.2.)  Insignia also produces evidence indicating duration of NAMI's retailer contracts, as well as NAMI's strategy to stagger those contracts, forecloses opportunities to enter or compete in the market. (Overstreet Report, Docket No. 516, Ex. 3 at 73.)

Under these circumstances, the Court cannot conclude as a matter of law that the procompetitive benefits of NAMI's exclusive contracts outweigh the harm caused by those contracts.  Because Insignia has produced evidence of both antitrust injury in the

form of foreclosure and injury to itself, the Court denies NAMI's motion for summary judgment as to Section 1 of the Sherman Act, Section 3 of the Clayton Act, and their Minnesota counterparts.

### 3.      Section 3 of the Clayton Act and Minnesota Statute § 325.d53

Section 3 of the Clayton Act "proscribes sales made on the condition that the buyer not use or deal in competing **products**." *Famous Brands, Inc. v. David Sherman Corp.*, 814 F.2d 517, 524 (8th Cir. 1987) (emphasis added); *see also* 15 U.S.C. § 14 (referring to "sale[s] of goods, wares, merchandise, machinery, supplies, or other commodities"). NAMI argues that it is entitled to summary judgment on Insignia's Section 3 claims because Insignia has not produced evidence of a "conditional agreement," i.e., that NAMI's retailer contracts require CPGs to deal only in NAMI's goods and prohibit CPGs from buying from NAMI's competitors. NAMI also contends that it only provides "services" to the market, as opposed to "tangible commodities."

There does not appear to be support, however, for NAMI's "conditional agreement" claim. Indeed, the Supreme Court has held that under the Clayton Act, the question is not whether an agreement **formally precludes** a buyer from dealing with other sellers, but whether that is the agreement's "practical effect." *Tampa Elec.*, 365 U.S. at 326-27 ("[E]ven though a contract does not contain specific agreements not to use the (goods) of a competitor, if the practical effect is to prevent such use, it comes within the condition of the section as to exclusivity." (internal quotation marks and alteration omitted)). Here, there is sufficient evidence that when a CPG contracts with NAMI,

NAMI's retail exclusivity will prevent the CPG from contracting with NAMI's competitors.

In addition, to determine whether a mixed offering falls under the purview of the Clayton Act, the Court must consider the "dominant nature of the transaction." *Tri-State Broad. Co. v. United Press Int'l, Inc.*, 369 F.2d 268, 270 (5th Cir. 1966).  Although the Court notes that Insignia and NAMI characterize their offerings as "promotional services," that characterization is not dispositive in a dominant-nature analysis.  Here, the parties extensively discuss POPSigns, Price Pops, Shelftalk, floor decals, and a variety of other advertising tools.  It is also undisputed that CPGs contract with TPPs to purchase a variety of those tactics, which vary in their tangible nature, look, and positioning.  The evidence indicates that CPGs consider the **specific tactic** and its effect on consumers when they contract with Insignia or NAMI to advertise their products.  Accordingly, the Court finds that NAMI and Insignia contract with CPGs for the sale of products under the "dominant nature" test, and Insignia's claims therefore fall under the purview of Section 3.  Accordingly, NAMI's motion is denied to the extent that it seeks summary judgment on Section 3 of the Clayton Act or its Minnesota counterpart.

### F.    Lanham Act and MDTPA Claims

To establish its false advertising claims under the Lanham Act or MDTPA, Insignia must establish:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence

the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

*See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1180 (8th Cir. 1998).  To be commercial advertising under Lanham Act one's statements must be "disseminated sufficiently to the relevant purchasing public . . . within that industry."  *Porous Media Corp. v. Pall Corp.* (*Porous Media II*), 173 F.3d 1109, 1121 (8th Cir. 1999) (internal quotation marks omitted).

NAMI asserts that Insignia has failed to produce evidence that NAMI's alleged disparaging statements about Insignia compliance influenced Insignia customers and, as a consequence, caused Insignia injury.  The parties dispute whether to apply the causation standard for non-comparative or comparative advertising cases.  NAMI asks the Court to apply the causation standard for a non-comparative advertising case.   Under that standard, Insignia must prove causation-in-fact.  *3M Innovative Props. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp. 2d 958, 972 (D. Minn. 2005); *see also Porous Media Corp v. Pall Corp.* (*Porous Media I*), 110 F.3d 1329, 1334 (8th Cir. 1997) ("[I]n cases where there is no comparative advertising involved, the plaintiff must shoulder the full burden of proof of both cause in fact and injury.").  Insignia, however, argues that NAMI's disparaging statements were comparative and accordingly that Insignia is entitled to a presumption of causation and harm.  *See Porous Media Corp*, 110 F.3d at 1334, 1338.

The Court agrees with Insignia that this case addresses comparative advertising. *Cf. Porous Media Corp.*, 110 F.3d at 1334 ("[W]here a defendant is guilty of misrepresenting its own product without targeting any other specific product, it is erroneous to apply a rebuttable presumption of harm in favor of a competitor."). Indeed, the Porco Letter and the Compliance Flyer explicitly compare NAMI's field-force compliance rates to Insignia's compliance rates. As a result, causation and harm are both presumed here. *See Porous Media Corp.*, 110 F.3d at 1336. Moreover, Insignia has produced sufficient evidence that NAMI's allegedly disparaging statements caused Insignia's losses.

In the alternative, NAMI contends that Insignia has not established that the statements were false or material. (*See* NAMI Mem. in Supp. of Mot. for Summ. J., Docket No. 473 at 19 n.9.) As noted above, however, Insignia produces evidence that NAMI reported compliance rates on a selective basis; that is, that NAMI reported compliance rates for the first week of the audit, which were lower than compliance rates for the second week, thereby distorting results from the audit. Further, Insignia brings forth evidence indicating NAMI's audit was methodologically flawed and deviated from methods NAMI used to conduct its own audits. Finally, Insignia has provided evidence that clients relied on the compliance report in the Porco letter and on NAMI's sales team's representations about compliance rates in electing to contract with NAMI. Under these circumstances, the Court denies NAMI's motion for summary judgment as to Insignia's false advertising claims.

The Court previously noted in its Order denying NAMI's motion to dismiss that "[b]ased on [Insignia's] allegations in the amended complaint, the Court is somewhat skeptical that Insignia will ultimately prevail on its claims in the case." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No. 04-4213, 2006 WL 1851137, at *7 (D. Minn. June 30, 2006). Here, Insignia has adduced sufficient evidence to survive summary judgment. The Court notes, however, the potential challenges that Insignia faces in demonstrating the credibility of its damages assessment, as well as its claims about NAMI's market power, in light of NAMI's challenges to Insignia's ACV calculations.

## III. INSIGNIA'S MOTION FOR SUMMARY JUDGMENT

NAMI filed amended counterclaims against Insignia and Insignia President Scott Drill in January 2007, alleging (1) violations of the Lanham Act, (2) violations of the MDTPA, (3) violations of New York and Massachusetts deceptive practices laws, (4) tortious interference with existing business relationships, (5) tortious interference with a prospective economic advantage, (6) unfair competition, (7) slander *per se*, and (8) libel *per se*.[10] NAMI seeks an array of remedies, including monetary damages and declaratory and injunctive relief. Insignia and Drill now move for summary judgment on NAMI's counterclaims.

---

[10] NAMI and Insignia agreed that New York substantive law governs counterclaims 3, 4, 5, and 6.

### A.      Damages

Insignia argues that NAMI has not produced adequate evidence that Insignia's conduct as alleged in Claims 1-6 of its counterclaims damaged NAMI.   As a consequence, Insignia contends that NAMI cannot recover damages for those counterclaims.[11]   Indeed, it appears that NAMI has abandoned its attempt to secure an award of damages for some of those claims. (*See* NAMI's Mem. in Opp'n to Mot. for Summ. J., Docket No. 508 at 37; *id.* at 51.)   The Court finds no evidence in the record demonstrating that NAMI suffered damages as a result of Insignia's alleged conduct in Claims 1-6.   Accordingly, Insignia's motion is granted to the extent that it seeks anything other than declaratory or injunctive relief for those claims.

### B.      Disparagement: Claims 1, 2, 3, 7, and 8

NAMI alleges five counterclaims based on allegedly disparaging statements that Drill and Insignia made about NAMI's business.   In Claims 1 and 2, NAMI alleges violations of the Lanham Act, 15 U.S.C. § 1125, and the MDTPA, Minn. Stat. § 325D.44, which prohibit deceptive trade practices and unfair advertising.   To prevail on its claims under either act, NAMI must show (1) that the defendant made false statements of fact about the complainant's products or services in an advertisement;  (2) the statements actually deceived or tended to deceive a "substantial segment" of the relevant audience; (3) the deception was likely to influence buying decisions; (4) the defendant

---

[11] Under Minnesota defamation *per se* law, general damages are presumed. *Steumpges v. Parke, Davis & Co.*, 297 N.W.2d 252, 259 (Minn. 1980).

caused the false statement to enter interstate commerce; and (5) the complainant has been or is likely to be injured as a result.  *See LensCrafters, Inc. v. Vision World, Inc.*, 943 F. Supp. 1481, 1488 (D. Minn. 1996). With respect to the fifth element, "[w]hen a plaintiff seeks only injunctive relief, however, it need only prove a likelihood of confusion among consumers that has resulted from the defendant's violation."  *Id.* at 1489-90.

In Claim 3, NAMI alleges violations of Massachusetts and New York deceptive trade practices laws.  The Massachusetts statute makes unlawful "the use or employment by [a] person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice."  Mass. Gen. Laws ch. 93A, § 11.  A plaintiff must prove damages with "a reasonable degree of certainty, yet short of mathematical exactness."  *Kobayashi v. Orion Ventures, Inc.*, 678 N.E.2d 180, 186 (Mass. App. Ct. 1997).  Insignia also brings a claim under New York law, which makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  N.Y. Gen. Bus. Law § 349(a), (g).  To succeed under the New York statute, a claimant must show that an injury resulted to consumers or the general public.  *See New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002).

In Claims 7 and 8, NAMI alleges slander *per se* and libel *per se* under Minnesota law.  To proceed on either claim a complainant must allege that the other party made "(a) a false and defamatory statement about the plaintiff, (b) in unprivileged publication to a third party, (c) that harmed the plaintiff's reputation in the community."  *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1011 (8th Cir. 2005) (applying Minnesota law).  "Among

those types of action which are defamatory per se are false accusations of committing a crime and false statements about a person's business, trade, or professional conduct." *Becker v. Alloy Hardfacing & Eng'g Co.*, 401 N.W.2d 655, 661 (Minn. 1987).

### 1.    Factual Basis for NAMI's Disparagement Claims

NAMI alleges that Drill repeatedly made false and disparaging statements of fact to CPGs, retailers, and the public that NAMI was engaging in unlawful, anticompetitive conduct.  First, Insignia points to three letters from Drill to CPGs and retailers.  In the first letter, dated February 21, 2003, Drill responded to the Porco Letter outlining NAMI's audit results:

> As we think you will agree when you read the letter, **NAM's objective is quite transparent**.  We believe that the purpose of the disparagement of Insignia's and FLOORgraphics' compliance is to **irreparably harm Insignia and FLOORgraphics, NAM's two primary competitors** in the in-store promotional marketplace.
>
> From our perspective, NAM is clearly willing to **go to great lengths** to achieve this objective . . . . [In a letter from a NAM executive to CPGs] NAM proposed **a backroom deal** in which one of the **key objectives** was to substantially reduce the payments that retailers like you receive for putting up our signs.

(Letter from Scott Drill, Feb. 21, 2003, Docket No. 509, Ex. 61 at NA07-0878360

(emphasis added).)

Drill sent an additional letter on June 18, 2004, in which Drill asserted:

> News America Marketing In-Store (NAMIS) is on a **mission to destroy competition** from FLOORgraphics, Inc. and Insignia POPS.®  If NAMIS succeeds in this mission, your company is **likely to pay higher prices** for the NAMIS product line.  Further, you will experience situations in which **you are locked out of major categories** for extended periods of time.  The

NAMIS vision for the future is **to charge brands more and pay the retailers less**.

(Letter from Scott Drill, June 18, 2004, Docket No. 509, Ex. 62 at IS07-212467 (emphasis added and omitted).)

Drill followed up with CPGs in another letter on February 16, 2006, adding: "I want you to know there are highly effective alternatives to News America's shelf and floor programs, especially if you are one of the many consumer packaged goods manufacturers who have been locked-out of the in-store advertising market by News America." (*Id.*, Ex. 65 at IS07-212469.)   Drill then repeated language excerpted *supra* from his June 18 letter.   Drill concluded, "While NAMIS brazenly claims their business practices ' . . . do not inhibit competition,' we both know otherwise." (*Id.*)

NAMI also claims that Drill made disparaging remarks about NAMI's business in an October 25, 2005, conference call with financial analysts to discuss Insignia's third quarter earnings.   (Tr. of Oct. 25, 2005, Conference Call, Docket No. 509, Ex. 64.) During that call, Drill noted pessimism about short-term revenue prospects from POPSigns sales due "primarily" to the "cumulative effects of illegal anti-competitive conduct by News America." (*Id.*)

NAMI also alleges that Insignia persuaded retailers and CPGs that the exclusivity provisions in NAMI's contracts were unenforceable and that Insignia could place its products in stores simultaneously with NAMI's products.

2.      **Statements of Fact**

a.      **Drill's Letters and the Conference Call**

Insignia argues that Drill's statements in the conference call and the three letters to CPGs and retailers are non-actionable statements of opinion. Minnesota law recognizes that the First Amendment absolutely protects opinion that lacks "a provably false statement of fact." *Hunter v. Hartman*, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996). Indeed, under the Lanham Act and MDTPA, NAMI must prove that Insignia made false statements of fact about NAMI's products or services. *See LensCrafters*, 943 F. Supp. at 1488. Similarly, to establish claims for slander *per se* and libel *per se*, NAMI must show that Drill made a false statement of fact about NAMI. *See Jadwin v. Minneapolis Star & Tribune Co.*, 390 N.W.2d 437, 440 (Minn. 1986). A statement of opinion also does not provide a basis for liability under Massachusetts or New York deceptive practices laws. *Aquino v. Pacesetter Adjustment Co.*, 416 F. Supp. 2d 181, 197-98 (D. Mass. 2005); *Global Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 706-07 (S.D.N.Y. 1997).

Whether a statement is fact or opinion is a question of law for the Court. *See, e.g.*, *Stock v. Heiner*, 696 F. Supp. 1253, 1259-60 (D. Minn. 1988). Courts look at four factors to distinguish statements of fact from those of opinion: (a) a statement's precision and specificity, (b) a statement's verifiability, (c) the social and literary context in which the statement was made, and (d) the statement's public context. *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302-03 (8th Cir. 1986). The Eighth Circuit has highlighted the

importance of the second factor, holding that a statement is not actionable unless it is "provably false." *Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 811 (8th Cir. 2007).

### i.      *Dial A Car*

This Court previously noted inconsistency among opinions addressing statements about the legality of another party's conduct:  "Some courts have determined that statements implying the illegality of conduct are factual assertions, while others have held that similar statements are nonactionable statements of opinion." *Insignia Sys., Inc. v. News Am. Mktg. In-Store, Inc.*, No 04-4213, 2007 WL 2893374, at *3 (D. Minn. Sept. 28, 2007).   The Court, mirroring analysis from *Janklow*, went on to note: "The inquiry in these cases . . . involves a consideration of not only the words themselves but also the context in which the statements were made[,] . . . includ[ing] an examination of whether the legality of the conduct has already been decided or is otherwise known to the speaker at the time of the statements." *Id.*   In support of that assertion, the Court cited *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484, 489 (D.C. Cir. 1996).   The Court concluded:

> If a speaker is aware that statements are either untrue or unsupported conclusions not based on the prevailing law, then the statements are provably false and therefore actionable.  If, on the other hand, the speaker is only opining on unsettled areas of the law, the statement is one of opinion.

*Insignia*, 2007 WL 2893374, at *4.

Insignia places significant import on the Court's reference to *Dial A Car*.  Indeed, although the this Court referenced *Dial A Car* in support of its reasoning under *Janklow*, *Dial A Car* is factually distinguishable from the instant case.  *Dial A Car* addressed

allegedly defamatory statements that were made regarding the plaintiff's actions under a regulation that had not been interpreted. *See Dial A Car*, 82 F.3d at 489. Here, federal and state antitrust law is clearly established and is supported by a mass of case law interpreting its provisions. Thus, Insignia's reliance purely on *Dial A Car* at summary judgment is inappropriate.

### ii.   Drill's Statements Are not Actionable

Regardless, the Court finds that in the Eighth Circuit, Drill's statements are non-actionable statements of opinion. A party's statements are not actionable unless the statements are "provably false." *See Fjelsta*, 488 F.3d at 811. The Eighth Circuit has also held:

> A commentator who advocates one of several feasible interpretations of some event is not liable in defamation simply because other interpretations exist. Consequently, remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of "falsity" is possible in such circumstances.

*McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 853 (8th Cir. 2000) (quoting *Hunter*, 545 N.W.2d at 707).

Here, Drill's statements to CPGs and retailers reflect Drill's interpretation of NAMI's conduct in the in-store promotions business. The mere fact that there are alternative, feasible interpretations of NAMI's conduct, i.e., that they were not engaging in anticompetitive conduct, is insufficient to render Drill's statements actionable. For example, in the February 2003 letter, Insignia stated, "we think you will agree . . . [that] NAM's objective is quite transparent," and "We believe the purpose of the disparagement

. . . is to irreparably harm Insignia and FLOORgraphics."   (Letter from Scott Drill, Feb. 21, 2003, Docket No. 509, Ex. 61 at NA07-0878360.)   Further, Drill stated, "From our perspective, NAM clearly is willing to go to great lengths to achieve this objective." (*Id.*)   Although expressions of opinion that "imply an assertion of objective fact" may be actionable statements, *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16-18 (1990), Drill's statements clearly reflected a feasible interpretation of NAMI's conduct.   Indeed, the parties continue to dispute the merits of Drill's and Insignia's interpretations of NAMI's conduct in the instant litigation.   Similarly, Drill's assertion that NAMI proposed a "backroom deal" is also not actionable; indeed, NAMI appears to quibble only with the characterization of the deal, and not the underlying facts.

The June 18 and February 16 letters are also not actionable.   Insignia states that NAMI is on a "mission to destroy competition" and then offers its view of the purposes and consequences of those activities.   Because NAMI's actions are subject to multiple interpretations, as can be inferred from the dispute in the present antitrust litigation, those statements are not actionable.   Indeed, even to the extent that the February 16 letter implies that some CPGs have already been "locked-out," that statement reflects a feasible interpretation of NAMI's conduct.

Further, Drill's statement in the conference call is not actionable because it was made to financial analysts in the context of a discussion of the present litigation. Although NAMI contends that Drill's statements were not couched in a discussion of the antitrust litigation, the Court disagrees.   Drill's statement came exactly one sentence

before he mentioned the legal ramifications of the NAMI's alleged conduct, and the statement that there was ongoing litigation about the issue was, in fact, true.[12]

In sum, the Court finds that the statements in the three Insignia letters and the conference call are all non-actionable statements of fact because they are not provably false. That is, Drill merely offers a feasible interpretation of events that are susceptible to multiple interpretations. Accordingly, Insignia's and Drill's motions for summary judgment is granted as to counterclaims 1, 2, 3, 7, and 8.

### 3.    Qualified Privilege

Even if the Court determined that Drill's statements are actionable statements of fact, NAMI's claims for defamation *per se* must be dismissed because Drill's statements were privileged. Courts apply qualified privilege to protect parties from liability for statements "made in good faith and . . . upon a proper occasion, from a proper motive, and . . . based upon reasonable or probable cause." *Bol v. Cole,* 561 N.W.2d 143, 149 (Minn. 1997) (citations and internal quotation marks omitted). The Court determines qualified privilege as a matter of law. *Id.*

---

[12] NAMI's counterclaims suggest that their disparagement allegations encompass a broader range of statements, including statements made to retailers that NAMI's exclusive contracts were unlawful and unenforceable. NAMI, however, only briefly mentions these statements in its analysis. (*See* NAMI's Mem. in Opp'n to Mot. for Summ. J., Docket No. 508 at 40, 45.) Regardless, the Court finds that those statements are not actionable. Insignia referred – or admits that it referred – retailers to information about a Department of Justice investigation into exclusivity provisions in in-store promotions contracts. To the extent that NAMI's evidence references the investigation, NAMI has not demonstrated that the statements were false. That is, there is no evidence that the Department of Justice was not conducting an investigation of exclusive in-store contracts.

"A qualified privilege can be withdrawn if a plaintiff can show that defamatory statements were made with actual malice." *McClure v. Am. Family Mut. Ins. Co.*, 223 F.3d 845, 854 (8th Cir. 2000). "This is a question of fact, and is reviewed on summary judgment to determine whether the evidence submitted raises a genuine issue of material fact." *Id.* Malice is defined as "actual ill-will or a design causelessly and wantonly to injure plaintiff." *Bol*, 561 N.W.2d at 150.

The Court previously denied Insignia's motion to dismiss NAMI's defamation *per se* counterclaims, finding that NAMI had properly alleged that Insignia "made the statements knowing them to be false and with the purpose of unfairly harming NAMI." *Insignia*, 2007 WL 2893374 at *5. There is no indication at the summary judgment stage, however, that Drill knew that his statements were false. NAMI offers evidence indicating that no CPGs were, in fact, "locked-out" of major categories by NAMI's conduct, but that evidence does not suggest Drill **knew** his statements were false. Rather, as the Court concludes *supra*, even now NAMI cannot demonstrate the threshold issue of falsity, as a finder of fact has yet to determine whether the underlying antitrust claims are viable. Further, NAMI has not produced evidence suggesting that Insignia made the statements with ill will or for the purpose of unfairly injuring NAMI. Accordingly, counterclaims 7 and 8 should be dismissed for the additional reason that the statements are privileged and there is no issue of material fact regarding abuse of qualified privilege.

### C.    Tortious Interference: Claims 4 and 5

NAMI concedes that it cannot establish damages for its tortious interference allegations, noting that any attempt to calculate losses would be too speculative.  Rather, NAMI now only seeks a "declaration that Insignia's past conduct constituted tortious interference with contractual and prospective business relations, and an injunction against such future tortious conduct by Insignia."  (NAMI's Mem. in Opp'n to Mot. for Summ. J., Docket No. 508 at 37.)

NAMI alleges that Insignia is liable under New York law for tortious interference with existing business relationships because Insignia intentionally coerced NAMI's retailers into breaching their exclusive contracts with NAMI.  NAMI also brings a claim for tortious interference with prospective economic advantage.  To proceed on a claim for tortious interference with contractual relations or with an existing business relationship, a complainant must set forth facts establishing that (1) there was a valid contract between the complainant and a third party, (2) the defendant had knowledge of the contract, (3) the defendant intentionally procured the breach of the contract without justification, and (4) the claimant incurred damages.  *See Maalouf v. Salomon Smith Barney, Inc.*, No. 02 Civ. 4770, 2003 WL 1858153, at *8 n.9 (S.D.N.Y. Apr. 10, 2003).

To establish a claim for tortious interference with a prospective business advantage under New York law, a complainant must show that (1) the complainant has a business relationship with a third party, (2) the defendant interfered with the relationship, (3) the defendant acted with the purpose of harming the plaintiff or acted with improper means to accomplish the interference, and (4) the complainant's business relationships

are injured. *Scutti Enters., LLC v. Park Place Entm't Corp.*, 322 F.3d 211, 215 (2d Cir. 2003).

### 1.     Factual Basis for NAMI's Tortious Interference Claims

NAMI contends that Insignia was aware that NAMI had valid, enforceable agreements with twelve retailers, and that those agreements granted NAMI the exclusive right to provide in-store shelf messaging signs.  NAMI claims that despite that knowledge, Insignia entered into contracts with the twelve retailers during the term of the NAMI agreements, sent POPSigns to those retailers while NAMI's exclusivity clauses were in force, and sent no-price signs ("TOPS") to retailers with "carve-outs," even though the no-price signs violated NAMI's exclusivity clauses.

In 2003, Insignia began producing POPSigns on paper with a perforated bottom on which the price was printed, known as a "Tear Off Price Sign" or "TOPS."  Thus, if Insignia printed the wrong price or if the retailer changed the price of a product, store employees could tear off the price on the perforated card stock.  The resulting visual would be only a product image, product information, and brand equity messaging, without any price.  NAMI alleges that Insignia knew that retail-store employees would not reliably write prices on TOPS signs after tearing off inaccurate prices, and that retailers' agreements with NAMI prohibited the retailer from installing signs from other TPPs that display only brand-equity messages.  NAMI claims that, regardless of that knowledge, Insignia sent TOPS signs to retailers for installation.

NAMI also alleges that Insignia made misleading statements to retailers about the scope and enforceability of the exclusivity provisions in NAMI's retailer contracts.

### a.      Tortious Interference with Contract:  Claim 4

To establish a claim for tortious interference with a contract under New York law, a party must demonstrate that the contract was breached.  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007) ("In a contract interference case . . . the plaintiff must show the existence of its valid contract with a third party, defendant's knowledge of that contract, defendant's **intentional and improper procuring of a breach**, and damages." (emphasis added)).  In NAMI's opposition brief, NAMI states: "this Court should accept that these twelve retailers breached their agreements with NAMI by signing contracts with Insignia and by mounting and displaying Insignia POPSigns in their stores during the terms of their agreements with News America."  (NAMI's Mem. in Opp'n to Mot. for Summ. J., Docket No. 508 at 28-29).  Essentially, NAMI asks the Court to find as a matter of law that the twelve retailers breached their exclusive agreements with NAMI.

NAMI, however, does not identify the twelve retailers who allegedly breached their exclusive agreements with NAMI, does not identify the unique provisions in those retailers' agreements, and does not provide the Court with any evidence tending to establish its potential breach-of-contract claims against those retailers.  Indeed, it does not appear that NAMI sought to establish, through adjudication or otherwise, that the retailers did, in fact, breach their agreements.  NAMI has failed to establish that the retailers

breached their contracts with NAMI and has failed to provide evidence from which the Court could independently conclude that there was a breach. Accordingly, the Court grants Insignia's and Drill's motions for summary judgment as to counterclaim 4 for tortious interference with contract.

### b.   Tortious   Interference   with   a   Prospective   Business Relationship:  Claim 5

The New York Court of Appeals stated:

> While New York law recognizes the tort of interference with both **prospective** and **existing** contracts, "greater protection is accorded an interest in an existing contract (as to which respect for individual contract rights outweighs the public benefit to be derived from unfettered competition) than to the less substantive, more speculative interest in a prospective relationship (as to which liability will be imposed only on proof of more culpable conduct on the part of the interferer)."

*White Plains*, 867 N.E.2d at 383 (quoting *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)).

Although NAMI contends that several different Insignia actions injured NAMI's business relationships, NAMI offers no evidence of that injury. Rather, NAMI relies on conclusory statements that it "would have made additional sales in the absence of tortious interference by Insignia;" "Insignia's conduct also caused injury to News America by devaluing News America's contracts with its retailers and CPGs;" and "Insignia signs diminished the value of at-shelf exclusivity for which News America had paid its retailers." (NAMI's Mem. in Opp'n to Mot. for Summ. J., Docket No. 508 at 34-36.)

In its Order denying Insignia's motion to dismiss, the Court found that NAMI properly pled a claim for tortious interference with a prospective business relationship

because NAMI alleged "that its customers discontinued exclusive business with it as a result of Insignia's conduct and that it would have entered into contracts with other retailers and packaged good companies had Insignia not made the comments at issue." *Insignia*, 2007 WL 2893374, at *9.   NAMI, however, has not adduced evidence establishing that its customers stopped doing exclusive business with it or that it would have entered into additional contracts with other retailers were it not for Insignia's conduct.   Regardless of the fact that NAMI only seeks declaratory and injunctive relief, it still must establish the type of injury that this tortious interference claim was designed to prevent: the loss of prospective business opportunities.   *See Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, No. 96 Civ. 1103, 1996 WL 724734, at *4 (S.D.N.Y. Dec. 17, 1996).   Even to the extent that NAMI offers evidence that the value of its exclusivity provisions was reduced by Insignia's alleged interference, NAMI has produced no evidence that such interference actually harmed prospective business relationships or that retailers or CPGs decided not to do business with NAMI as a consequence.   Accordingly, the Court grants Insignia's and Drill's motions as to counterclaim 5 for tortious interference with prospective business relationships.

### D.    Unfair Competition: Claim 6

"Unfair competition is defined as any form of unlawful business injury [that] is tortious in nature . . . [and i]n essence, [New York's unfair competition law] requires

business rivals to compete honestly and fairly."[13]   *Michele Pommier Models, Inc. v. Men Woman NY Model Mgmt., Inc.*, 14 F. Supp. 2d 331, 337 (S.D.N.Y. 1998) (internal quotation marks omitted and first and second alterations in the original).   To the extent that NAMI's claim for unfair competition is premised on unlawful activity as alleged in its other counterclaims, the Court grants Insignia's and Drill's motions for summary judgment as it has not demonstrated that it suffered any "unlawful business injury" under counterclaim 6.

## IV.   INSIGNIA'S MOTION TO COMPEL

Finally, on April 24, 2009, Insignia filed a motion to compel the production of files and documents presently in NAMI's possession.   First, Insignia moves to compel production of a back-up data file on which NAMI's expert, Dr. Kevin Murphy, relied in separate state and federal litigation between Valassis Communications and NAMI.   *See Valassis Commc'ns, Inc. v. News Am. Inc., et al.*, Case No. 07706634-CZ (Mich. Cir. Ct., Wayne County) and *Valassis Commc'ns, Inc. v. News Am. Inc., et al.*, Case No. 06-10240 (E.D. Mich.) (the "*Valassis* litigation").   Second, Insignia seeks to compel the production of the expert report of Dr. Robert Topel, who was NAMI's damages expert in the *Valassis* litigation, because Insignia asserts that Dr. Murphy's report in *Valassis*

---

[13] Although the Court ultimately determines that NAMI's unfair competition claim cannot survive because NAMI has failed to produce evidence of damages, the Court also notes its general suspicion that the unfair competition claim is merely duplicative of NAMI's other claims.   *See Insignia Sys. Inc. v. News Am. Mktg. In-Store, Inc.*, Civ. No. 04-4213, 2007 WL 2893374, at *10 (D. Minn. Sept. 28, 2007); *see also H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*, 879 F.2d 1005, 1025 (2d Cir. 1989) ("[S]uch an amorphous cause of action is capable of mischievous application." (internal quotation marks omitted)).

expressly relies on Dr. Topel's report.   Third, Insignia requests that the Court order NAMI to make a complete showing of its efforts to produce a missing set of minutes of NAMI's December 9, 2002, Executive Committee meeting.

NAMI objects to the motion, arguing that the legal standards and theories in the *Valassis* litigation are inapposite from the standards and theories in the instant antitrust litigation.   NAMI also argues that Insignia's motion should be denied because it is untimely.

Under these circumstances, the Court finds that the back-up data file for Dr. Murphy's report is relevant to Insignia's antitrust claims.   In particular, Dr. Murphy testified in the *Valassis* trial that NAMI discounted in-store promotions prices for CPGs in order to gain additional advertising business.   That testimony, and the back-up data file supporting the testimony, is directly relevant to NAMI's assertion here that NAMI's prices for in-store promotions for CPGs dropped by 35 percent over the relevant time period.   Moreover, the Court does not find that Insignia's request is untimely, as Insignia represented that it pursued production of back-up data file as soon as Insignia learned of its import.   Accordingly, the Court grants Insignia's motion to compel the back-up data file for Dr. Kevin Murphy from the *Valassis* litigation.

Further, because Dr. Murphy relies on Dr. Topel's report in the *Valassis* litigation, and because the Court finds that Dr. Murphy's report is relevant to the present litigation, the Court grants Insignia's motion to the extent it seeks production of Dr. Topel's report.

Finally, the Court also denies Insignia's request that the Court order NAMI to make a complete showing of its efforts to comply with the Court's previous Order

regarding the search for and production of Executive Committee meeting minutes. NAMI has repeatedly represented that it made reasonable efforts to locate the requested documents, but has been unable to locate them. In the Court's view, such representation at this important stage of the litigation satisfies any concern the Court may have regarding NAMI's efforts.

## ORDER

Based on the foregoing, and all the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     News America Marketing In-Store, Inc.'s Motion for Summary Judgment [Docket No. 473] is **GRANTED in part** and **DENIED in part** as follows:

    a.     The motion is **GRANTED** as to Insignia's allegations that NAMI possesses monopsony power over retailers; and

    b.     The motion is **DENIED** in all other respects.

2.     Insignia Systems, Inc.'s Motion for Summary Judgment [Docket No. 493] is **GRANTED**.

3.     Scott Drill's Motion for Summary Judgment [Docket No. 500] is **GRANTED**.

4.     News America Marketing In-Store, Inc.'s Motion to Exclude the Ball, Wesson, and Rodriguez Declarations and Undisclosed Damages Estimates [Docket

No. 523] is **DENIED** as to the declarations of Ball, Wesson, and Rodriguez and is

**DENIED without prejudice** as to the undisclosed damages estimates.

        a.      The Court further orders an extension of discovery of forty-five days

to permit News America Marketing In-Store, Inc. to address the substance of the

Ball, Wesson, and Rodriguez declarations.

    5.      Insignia Systems, Inc.'s Motion to Compel Production of Materials for Use

at Trial [Docket No. 542] is **GRANTED in part and DENIED in part** as follows:

        a.      The motion is **DENIED** as to the request for an order requiring

News America Marketing In-Store, Inc. to make a complete showing of its efforts

to locate December 9, 2002, Executive Committee meeting minutes; and

        b.      The motion is **GRANTED** in all other respects.  Defendant News

America Marketing In-Store, Inc. is **ORDERED** to produce (1) the back-up data

file for expert Dr. Kevin Murphy from the *Valassis* litigation and (2) the Report of

Dr. Robert Topel from the *Valassis* litigation.

DATED:  September 30, 2009           _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                JOHN R. TUNHEIM
                                  United States District Judge