# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| INSIGNIA SYSTEMS, INC, | Civil No. 04-4213 (JRT/AJB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| NEWS AMERICA MARKETING IN-STORE, INC, | |
| Defendant. | |

Stephen Wood and Julian Solotorovsky **KELLEY DRYE & WARREN LLP**, 333 West Wacker Drive, Suite 2600, Chicago, IL 60606; William C. MacLeod, **KELLEY DRYE & WARREN LLP,** 3050 K Street NW, Suite 400, Washington, DC 20007; and Robert L. Meller, Jr., **BEST & FLANAGAN LLP**, 225 South Sixth Street, Suite 4000, Minneapolis, MN 55402-4690, for Insignia Systems Inc.

David A. Ettinger, **HONIGMAN MILLER SCHWARTZ AND COHN,** 2290 First National Building, 660 Woodward Avenue, Detroit, MI 48226; Richard L. Stone, **HOGAN & HARTSON**, 1999 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067; and Todd A. Wind, **FREDRIKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425, for News America Marketing In-Store, Inc.

Insignia Systems, Inc. ("Insignia") filed this lawsuit against News America Marketing In-Store, Inc. ("News") in 2004 alleging violations of the Sherman Act, the Lanham Act, the Minnesota Antitrust Act, and the Minnesota Deceptive Trade Practices Act. The complaint alleges that News engaged in disparaging conduct, and anti-competitive behavior that damaged Insignia's sales and value. The Court granted in part

and denied in part News' motion for summary judgment, denying summary judgment on the antitrust and deceptive trade practices claims.

## BACKGROUND

News moves to exclude the expert testimony of Paula Payton, Steve Frenda, and Thomas Overstreet, as unreliable and founded on insufficient facts. The Court will grant in part News' motion with regard to Paula Payton; her experience is sufficient to allow her to testify about how consumer packaged goods companies ("CPGs") react to various communications from advertisers generally, but she lacks a reliable basis to opine specifically on how such communications impacted Insignia. Steve Frenda's testimony suffers from the same lack of a reliable factual basis specifically related to how Insignia was affected by News' alleged conduct, and is inadmissible for that purpose; accordingly, the Court will grant News' motion to exclude his testimony as to the actual effect of News' actions on Insignia. The Court will deny News' motion to exclude the testimony of Thomas Overstreet because it is based on sufficient facts and proper methodologies.

## ANALYSIS

## I. STANDARD OF REVIEW

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Under Rule 702, proposed expert testimony is admissible if it meets three prerequisites. *Lauzon v. Senco Prod., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in understanding the evidence. *Id.* Second, the proposed witness must be

qualified. *Id.* Third, the proposed evidence must be reliable in an evidentiary sense, so that if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.* The district court has a "gatekeeping" obligation to make certain all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597-98 (1993).

## II. DEFENDANT'S MOTIONS TO EXCLUDE PAULA PAYTON AND STEVE FRENDA

### A. Paula Payton

Payton was retained by Insignia to "bring [] perspective and expertise about in-store advertising to bear" on the issues in the litigation between Insignia and News. (Payton Rep. § 1.A, Singer Decl. Ex. A, Docket No. 652.) Payton was asked to offer opinions on the probable impact of allegedly misleading information propounded by News about Insignia to CPGs. She was also asked to offer opinions about how at-retail marketing compares with other forms of marketing.

Payton is currently a U.S.-based research affiliate of the Oxford Institute of Retail Management in the United Kingdom. She conducts research in the areas of store, department, and category innovation; in-store marketing; and shopper insights for leading retailers, CPGs, and industry trade groups. She co-chairs and teaches an executive education program on shopping insights, which aids CPG and retail executives in understanding and leveraging the effect of store environment on purchase decisions. Payton is the head of research at the Point of Purchase Advertising Institute ("POPAI") where she coordinates research studies on in-store marketing, and develops standards to

measure the impact of advertising at retail. Payton began her career conducting research for major CPGs, and was the principal of a marketing and promotion agency at Proctor & Gamble. Payton completed doctoral studies in cognitive psychology at the University of Chicago, and conducted academic research at various universities.

Payton's overall conclusion in her expert report is that Insignia was negatively impacted by News' actions in several ways. First, Insignia was damaged when News developed and circulated marketing materials and correspondence with inaccurate research representations of Insignia's in-store advertising compliance rate.[1] Payton writes that the marketing materials presented compliance rates based on audits that violated accepted research standards and principles. Payton alleges that CPGs would reasonably infer that a study done by a large media company, such as News, would be the result of careful research and would be accurate. "Research representations from [News] construing that [Insignia] had consistently poor execution would cause many CPGs to question, restrict, or even withdraw their business from [Insignia]." (Payton Rep. § 2.c.)

Payton further opines that CPGs would be faced with two adverse implications from News' portrayal of Insignia's compliance rates: (1) the cost of wasted promotional materials; and (2) lost sales opportunities. According to Payton, "[i]t is a key priority of CPGs to optimize their marketing productivity; therefore, a reasonable conclusion of a CPG would be that hiring [Insignia] had resulted in an extremely poor return on investment []." (*Id.* § 2.d.)

---

[1] The advertising compliance rate is the rate at which advertisements purchased for placement in stores were actually placed.

Finally, Payton states, "In my opinion, competitive products and companies in the in-store media space may not be in [News'] best interest, but they are what's best for the consumer, and ultimately for brands that have committed to serving their consumers better." (*Id.* § 9.)

**B.    Steve Frenda**

Frenda offers his expert opinions on, among other things, research standards for in-store compliance audits, the validity of News' 2002 and 2003 audits of Insignia, the manner in which the results of the audits were presented by News to Insignia's customers and prospects, and the significance of compliance to CPGs and the probable impact of News' alleged misrepresentations. (Frenda Rep. § II, Singer Decl. Ex. E.) News only challenges Frenda's opinions regarding the probable impact of News' misrepresentations regarding Insignia's compliance; it does not presently appear that it is challenging his methodological criticisms of the various compliance audits News conducted.

The part of his testimony most relevant to this motion is his conclusion that

> [t]he primary victims of [News'] campaign of disinformation were Insignia and its potential CPG clients. Those clients would have relied on the integrity of a major advertising supplier such as [News] to provide them with reliable data with which to help them make their in-store advertising purchase decisions. In this case, [News] violated their trust and had a major negative impact on the marketplace.

(Frenda Rep. § II.10.)

Frenda's opinions are based on thirty-six years of experience in retailer, manufacturer and market research. He has experience in the conduct of in-store

observational audits to measure the performance of all phases of retail marketing, merchandising and promotional activities.

### C.    Exclusion of Payton's Testimony and Report

#### 1.    Opinions Regarding Effect on Insignia's Business

Payton's qualifications to testify on the impact of News' alleged misrepresentations about Insignia to CPGs and retailers are not in dispute. Payton has worked in the in-store marketing field, in both academia and in corporations, for more than fifteen years and appears to be a leader in that field.

News argues that Payton's testimony about the impact of allegedly disparaging statements in materials sent to CPGs is pure speculation, and as such is unreliable and inadmissible. News characterizes Payton's testimony as speculating on the state of mind of CPGs, testimony which, News claims, courts routinely exclude. *See, e.g.*, *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs., Inc.*, 546 F. Supp. 2d 155, 179 (D.N.J. 2008) ("[I]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony[.]") (quotation omitted); *Highland Capital Mgmt. L.P. v. Schneider*, 379 F. Supp. 2d 461, 469-70 (S.D.N.Y. 2005). News points to a variety of assertions in Payton's testimony as being nothing more than speculation, and not based on surveys, interviews, or other information suggesting reliability. For instance:

- These materials **would have** negatively influenced advertisers' opinions . . . . (Payton Rep. § 2.a.)

- When . . . [News] publicizes research findings in correspondence and marketing materials to [CPGs], [they] **would reasonably infer** that legitimate, careful research had been conducted . . . . (*Id.* § 2.b.)

- Research representations from [News] construing that [Insignia] had consistently poor execution **would cause** many CPGs to [withdraw their business from Insignia]. (*Id.* § 2.c.)

News also points to Payton's deposition, in which she testified that she has no direct knowledge of how CPGs reacted to the allegedly disparaging letters and statements made by News, as evidence that her opinion is not reliable. (Payton Dep. 61:25-62-6, Singer Decl. Ex. C) ("Q: Would you agree that you've not offered any opinions in this case on how CPGs **actually** perceived statements made by [News]? A: Yes, I would agree. I don't know – have direct knowledge of how they actually reacted." (emphasis added)).

Insignia suggests that Payton's testimony is being offered to determine how CPGs and retailers would react to marketplace information, including whether that information would cause them to forego, reduce, or cancel business with Insignia. Insignia points to Payton's testimony to bolster its argument that her experience is sufficient to make her testimony reliable:

> It's been my experience that packaged goods companies have reacted – not reacted well to poor compliance numbers. I have seen it before, and I suspect I will see it again. Based on that knowledge, direct conversations with packaged goods companies about how important compliance is, how disappointing poor compliance is, I would infer that the negative information portrayed in [News America's communications] would cause them to respond negatively . . . . I have not had direct conversations with anybody on the topic, but I feel confident based on many conversations about compliance and how [CPGs] normally behave around poor compliance in projecting what their behavior would be.

(Payton Dep. 59:14-21, 61:14-19, McGuiness Decl. Ex. 7, Docket No. 664); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 119, 151 (1999).

As an initial matter, the Court finds that Payton's experience in the in-store retail market, both as an academic and a principal, provide her sufficient specialized knowledge to opine generally on the effect of poor compliance numbers on the purchasing behavior of CPGs. Further, the Court finds that Payton's expert report largely contains background information about the in-store advertising market, and provides insight into the reasoning and expected behaviors of CPGs. Thus, the Court will allow her testimony to provide context and background information on those topics.

A more difficult question is whether her opinions on the likely reactions of CPGs to the various alleged communications by News are admissible as expert testimony. News notes that a Magistrate Judge in New Jersey excluded testimony in almost identical circumstances. *Floorgraphics*, 546 F. Supp. 2d at 177-78. In that case, Floorgraphics, a News competitor, alleged that News was providing false and misleading information about Floorgraphics' business and products to CPG clients. Floorgraphics attempted to introduce the testimony of an expert who opined that "Defendants' conduct, if true, would have substantially impaired [Plaintiff's] ability to conduct business successfully and indeed could have led to the ruination of [Plaintiff's] business." *Id.* at 162 (quotation marks omitted). He further opined that News' alleged statements to retailers "would have likely created a negative impression of [Floorgraphics]." *Id.* (quotation marks omitted). In finding his testimony inadmissible, the court noted that "[t]he critical question in

establishing causation in a business torts case is whether plaintiff can identify specific admissible evidence in support of its contentions that wrongful conduct by the defendant caused plaintiff to lose specific business . . . ." *Id.* at 177-78. The court noted that plaintiff's argument for the admissibility of the expert's opinion was based in part on his "vast experience of the in-store marketing industry . . . ." *Id.* at 178. Thus, "while opining about the **likely** opinions of retailers and supplier reactions to various practices allegedly initiated by Defendants, [the expert] failed to show any **specific or actual** fact of a CPG or a retailer who can offer admissible testimony that the witness' company stopped doing business with Plaintiff . . . ." *Id.* (alteration in original). Ultimately, the court's problem with the expert's testimony about how CPGs likely reacted to certain alleged statements by News was its lack of reliability:

> Although Plaintiff's argument-that one can opine based upon experience-is true, such testimony must also explain how the experiences lead to the conclusion that is reached and why that experience is a sufficient basis for the opinion. More importantly, though, the expert must explain how that experience is reliably applied to the facts. Simply stated, [the expert's] testimony, and his explanation of his conclusions are not reliable, but rather entirely speculative.

*Id.* at 179 (citations omitted).

Although the court's holding was limited to situations in which causation needed to be demonstrated, that is, that retailers were actually influenced by misconduct, its reasoning is compelling. Payton repeatedly states that she did not speak to any CPG representatives, did not send out any surveys, conduct interviews, or rely on anything to formulate her opinion besides her experience in the industry and her review of discovery in this case. Insignia notes that many of the documents Payton reviewed contained

indications that News' alleged misrepresentations were having an impact on Insignia's business; thus, it argues that her review of the discovery documents was sufficient to provide a reliable basis for her opinions. (*See* McGuiness Decl. Exs. 9-14.) While it appears that Payton had access to documents suggesting some negative impact from News' activities, she testified that she had no knowledge of how CPGs actually reacted. (Payton Dep. 61:25-62-6, Singer Decl. Ex. C.)

Further, Insignia argues that deposition statements made by Insignia employees and reviewed by Payton indicate that she had a reliable basis for her opinions. Insignia essentially relies on two statements made by its Sales Vice President Greg Maresh that Insignia saw a drop in sales after News' allegedly disparaging conduct. (Maresh Dep. at 79:7-12, McGuiness Decl. Ex. 15.) At no point has Payton written or testified that she saw concrete information of harm to Insignia; all of her conclusions are based on how she infers or speculates a CPG would react given the information in the materials News sent to CPGs and retailers. This is not a reliable basis on which to offer an expert opinion to a jury that CPGs withdrew business, or that Insignia was **actually** harmed, because of News' actions. Thus, Payton's testimony is admissible for the limited purpose of providing background information about how CPGs have reacted to disparaging comments about companies like Insignia in the past, but she may not testify that there is any likelihood that News' actions caused damage, if any, to Insignia in this case.

## 2.     Exclusion of Antitrust Opinion

News argues that Payton has attempted to provide antitrust opinions exceeding the scope of her expertise.  Specifically, News objects to Payton discussing the relevant antitrust market in the in-store advertising business.  The basis for News' objections is that because Payton is not an economist, or in any other way an antitrust expert, she cannot opine on market definition or anti-competitive effects.  *See Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F. Supp. 2d 530, 536 (D. Md. 2002) ("[G]eneral business experience unrelated to antitrust economics does not render a witness qualified to offer an opinion on complicated antitrust issues such as defining relevant markets.").

Insignia responds that Payton's testimony is confined to the underlying facts, not the ultimate issue of relevant market.  For instance, Payton offers testimony on product substitutability and principal competitors.  *See Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806 (8th Cir. 1987) (relevant market established by, among others, regional sales manager and not an economist).

News also argues that Payton seeks to introduce opinions about the supposed anticompetitive effects of News' alleged conduct in the relevant market, such as her opinion that News restricts the choices of CPG customers.  (Payton Rep. § 2.f) ("'As the exclusive, dominant provider of at-shelf media, [News'] actions to hamper the viability of their primary at-shelf advertising competitor restricts CPGs' choices and ultimately, stifles the innovativeness and effectiveness of their in-store communications.").  Though this testimony comments on anticompetitive effects, both common sense, and Payton's experience, suggest that expertise in antitrust economics are not required to determine

that certain actions by a competitor have detrimental effects on its competition.[2]  Such basic facts, while potentially forming the basis for a description or analysis of a relevant antitrust market, are not by their nature facts that must be relayed by an economist or antitrust expert.  *See S & S Comms. v. Local Exch. Carriers Ass'n, Inc.*, No. 02-1028, 2006 WL 519651, at *15 (D.S.D. Mar. 1, 2006) ("Defendants contend that plaintiff's Section 2 claim must fail because plaintiff has no admissible expert testimony establishing the relevant product market or market share.  However, expert testimony is not always necessary to prove market or market share.").

Payton's "antitrust opinions" are simply her description of the various products and competitors within a market in which she has experience.  To exclude her opinion would be to exclude the ability of a non-antitrust expert to discuss markets in a general sense, or competitors within a market.  Though the Court cautions Insignia not to elicit opinions about antitrust legal issues with Payton, because Rule 702 is one of admission instead of exclusion, the Court will admit Payton's testimony about News' competitors to establish background facts.  *See* Fed. R. Evid. 702.

### D.    Exclusion of Frenda's Testimony and Report

News argues for the same reasons that Payton's testimony should be found inadmissible, Frenda's testimony should be excluded as well.  News notes that Frenda testified he had no knowledge, and has seen no evidence, of any actual economic injury

---

[2] Insignia also correctly notes that News has proffered no authority for the proposition that testimony on antitrust injury should be automatically excluded if the witness is not an economist.

to Insignia. Specifically, Frenda stated that he knew of no lost sales caused by News' statements regarding an audit in 2002:

> Q:    At the time that you wrote your report what specific damage were you aware was done to Insignia because of the NewsAmerica October 2002 audit?
>
> A:    I was not aware of specific damage.
>
> Q:    Can you identify a single lost piece of business with any CPG that Insignia incurred because of the [audit]?
>
> A:    No.

(Frenda Dep. 124:3-11.)

> Q:    [Please] turn your attention to [a portion of his report] which concludes, "which predictably did significant damage to Insignia." Which significant damage are you talking about specifically?
>
> A:    I'm – the fact that the conclusions are published in presentations that are delivered to clients I think from a – a trusted supplier. I'm making an assumption that considerable damage was done.

(*Id.* at 125:17-126:3.)

> Q:    What were the actual negative impacts on the marketplace that you observed [regarding the 2002 audit]?
>
> A:    [I] didn't observe anything . . . I'm assuming there had to be some considerable impact.

(*Id.* at 132:8-15.)

Because of this lack of information, News objects to Frenda's testimony that the 2002 audit "most certainly had an impact on Insignia's CPG customers and prospects,"

(Frenda Rep. § IX), "predictably did significant damage to Insignia," (*id.* § II.9), and that "[the alleged disinformation] had a major negative impact on the marketplace . . . ." (*id.* § II.10).

Speculation based on experience, particularly specific speculation about actual damages, with no evidence in support, cannot be a reliable basis for an opinion. Thus, the Court will grant News' motion to exclude Frenda's testimony about the actual impact of News' allegedly flawed audits on Insignia's business, or the in-store advertising market in general. However, Frenda's testimony related to the methods and appropriateness of News' audits is admissible.

## III. DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF THOMAS OVERSTREET

### A. Thomas R. Overstreet

Dr. Thomas R. Overstreet is an economist at CRA International, and specializes in industrial organization and antitrust economics. He received a Ph.D in economics from Vanderbilt University in 1986, and has worked as a professional economist analyzing antitrust and competition matters for approximately thirty years. He also worked as the Federal Trade Commission, ending his tenure there as the Assistant Director for Antitrust.

Insignia hired Overstreet to conduct an economic analysis of the issues raised in this case, and to assess damages that Insignia suffered as a result of News' conduct.

Overstreet concluded that the "relevant product market . . . is no broader than in-store advertising provided by third party suppliers." (Overstreet Rep. at 7, Ettinger Decl.

Ex. C, Docket No. 656.) Further, "[w]hile the exclusionary conduct at issue here adversely affects rivals' ability to compete effectively at the national level, the impact of [News'] exclusionary conduct on rivals is not uniform . . . [a]s a result, CPGs' options with respect to in-store advertising can vary by geography and so could price." (*Id.* at 7-8.) Overstreet opines that News' exclusionary conduct raises barriers to entry and expansion by rivals like Insignia, and because of the barriers, rivals are foreclosed from substantial portions of the market. Further, he opines that News' exclusionary conduct is not justifiable on efficiency grounds. According to Overstreet, "[t]he same conduct that has harmed competition has also harmed Insignia. Based on various assumptions about the appropriate benchmark for the 'but-for' world, [Overstreet] estimate[s] that Insignia's damages fall in the range of $121.7 million to $214.5 million." (*Id.*)

To estimate the damage done to Insignia, Overstreet uses two different approaches, which he describes as requiring the creation of a "but-for" world in which no harm was done, and comparing that world with reality. The first approach is to measure the adverse impact of the bad acts on the going concern value of the damaged business, that is, how Insignia's market value was adversely affected by bad acts. Overstreet's alternative approach breaks damages down into categories of harm, such as lost profits on lost sales, lost profits on actual sales due to increased costs, and incremental costs incurred in response to bad acts.

To evaluate the damage done to Insignia's market value, Overstreet uses two methods: a "cohort of other firms whose stocks traded on major U.S. stock exchanges as a benchmark or proxy for Insignia's but-for performance," and an evaluation based on

Insignia's market capitalization pre- and post- News' alleged bad acts. (*Id.*) This group of "comparables" is comprised of firms both similar in size to Insignia in terms of their market capitalizations, and whose then-recent growth performance was similar to Insignia's in the period prior to 2003. (*Id.* at 112-13.)

To evaluate the damage done to Insignia in terms of categories of harm, Overstreet asked Insignia executives to provide their best estimates of Insignia's expected future performance from the perspective of late 2002 through early 2003. The analysis he received focused primarily on estimating lost profits and lost sales.

From these analyses, Overstreet concluded that there was a substantial difference between the but-for world that Insignia would have existed in without News' alleged bad acts, and the world it actually confronted. Even so, he opines that "these damage estimates are likely conservative [in that they] implicitly assume the period prior to 2003 was not adversely impacted by [News'] conduct." (*Id.* at 113.) However, Overstreet notes that News' use of "exclusives," contracts precluding a store from utilizing both News and Insignia products, in its contracts with retailers was a constant throughout the period for which there is discovery information, that is, from before 2003. (*Id.*) He asserts that this fact supports his assertion that the estimates are conservative.

## B.    Exclusion of Overstreet's Report and Testimony

News seeks the exclusion of Overstreet's testimony as unreliable, and based on inaccurate and insufficient facts. News argues that: (1) the "stock market damages" conclusions Overstreet reaches are flawed, because the "comparable" company analysis

did not use truly comparable companies and because Overstreet failed to account for other causes of Insignia's stock price decline; (2) that the financial projections Overstreet relied on to determine damages related to POPSign[3], Insignia's primary product, are unreliable because they are based on projections from biased actors that were not subject to any reliable methodology, and are merely the *ipse dixit* of its proponents; and (3) Overstreet's damages analysis relating to Insignia's additional products are based on speculation without adequate facts or data. News also complains that: (4) Overstreet's damages models fail to distinguish between Insignia's claims; (5) the damages estimates fail to exclude damages from released claims; (6) the testimony regarding relevant product market fails to aid the jury in distinguishing between lawful and unlawful conduct; and (7) the testimony regarding exclusive contracts is not based on sufficient facts or data.

### 1. Stock Market Damages

News argues that Overstreet's damages analyses based on "comparable" companies and a fixed comparison of Insignia's market capitalization utilized unreliable methodology and should be excluded.

### a. Comparables

"In calculating lost future profits or lost business, the measure of damages is guided by analysis of 'comparable businesses **in the area**.'" *Loeffel Steel Prods., Inc. v.*

---

[3] POPSign is a shelf-based advertisement that combines product information with store-specific prices. Insignia offers several versions of the POPSign with different choices of colors and headers. (Overstreet Rep. at 22.)

*Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005) (quoting *Cates v. Morgan Portable Bldg. Corp.*, 591 F.2d 17, 21 n.7 (7th Cir. 1979)). "[T]he business used as a standard must be as nearly identical to the plaintiff's as possible." *Lehrman v. Gulf Oil Corp.*, 500 F.2d 659, 667 (5th Cir. 1974); *Nat'l Farmers' Org., Inc. v. Associated Milk Producers, Inc.*, 850 F.2d 1286, 1297 (8th Cir. 1988).

News argues that the "yardsticks" against which Overstreet conducted his analysis were not truly comparable because there are many reasons a company's stock price can vary, and that comparing Insignia, an advertising company, with a helicopter company (or the other industries represented by the comparables) in terms of profitability and market capitalization cannot be valid, because they are not comparable in all respects except for the allegedly unlawful acts. *See Home Placement Serv., Inc. v. Providence Journal Co.*, 819 F.2d 1199, 1205-206 (1st Cir. 1987) ("[Plaintiff] must attempt to measure its damages with reference to the performance of one or more closely comparable firms in the same industry that, unburdened by the proscribed anticompetitive activity, successfully managed to earn profits."). "Absent the requisite showing of comparability . . . [a damage model] is impermissibly speculative and conjectural." *Loeffel Steel Prods., Inc.*, 387 F. Supp. 2d at 812. News also notes that Overstreet testified that "almost all of [the] movements [of the comparable companies'] stock capitalizations would be moving [in a way that was] irrelevant to Insignia's capitalization. Those companies didn't have much to do with Insignia . . . they weren't affected by the same things Insignia was." (Overstreet Dep. 806:18-807:13, Nov. 6, 2008, Ettinger Decl. Ex. B.)

Overstreet provided a rebuttal report in which he explicitly addressed the issue of the suitability of the companies against which he compared Insignia:

> I recalculated my damages estimates using a variety of different sets of comparable companies created by adding or removing particular firms from the set of comparables . . . I added to the original set of comparables a set of firms that identified themselves as in the advertising business . . . the resulting damages estimate was approximately $195 million . . . I [also] added . . . firms [identifying themselves] as in the advertising business and that engaged in some physical placement of advertising . . . The resulting damages estimate was approximately $207 million . . . In short, the damages estimates are not overly sensitive to the composition of the comparables . . . and there is no justifiable reason to prefer [these companies] to my original set of comparables . . . .

(Overstreet Rebuttal at 29-31, Ettinger Decl. Ex. N.)

Insignia's argument, that in a small market it would be impossible to compare Insignia's market performance against competitors who were not affected by allegedly anticompetitive conduct, makes logical sense. Though the law is clear that comparable companies must be as similar as possible here, Overstreet explicitly compared Insignia to companies in the same market and found similar results to the original set of comparables that he chose based on similar market capitalizations.

### b.    Other Causes of Stock Price Decline

News argues that Overstreet failed to account for other causes of Insignia's stock price decline than News' allegedly disparaging activities. News says "[i]n both his 'comparables' and 'flat-line' analyses, Dr. Overstreet attributes the entire amount of Insignia's stock price decline . . . to News America's alleged misconduct." (Mot. to Exclude Overstreet at 12.) Essentially, News argues that Overstreet has improperly

substituted correlation for causation. The Eighth Circuit routinely concludes that expert testimony is inadmissible when an expert fails to account for multiple relevant circumstances. *See, e.g.*, *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 777 (8th Cir. 2004) (excluding an economic expert's opinion that defendant's conduct caused a drop in plaintiff's sales where he failed to account for other possible causes, such as the entrance of two competitors in the market); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1056 (8th Cir. 2000)..

News contends that the most obvious alternative explanation for the decline of Insignia's stock price is its "disappointing" fourth quarter earnings in 2002, **before** the allegedly disparaging materials were sent. On February 12, 2003, Insignia announced it had earned $0.03 per share, which was 67% below the amount analysts were predicting. Insignia's price dropped 28.4% after this announcement. (Expert Report of Kevin Murphy ¶ 78, Nov. 21, 2008, Ettinger Decl. Ex. H.) News argues that Overstreet did not account for this in his report, resulting in a flawed methodology.

Of particular note is the following from Overstreet's report:

> I performed a stock market event study that indicates that Insignia suffered a very pronounced abnormal loss in its stock value in February of 2003. This loss is associated in time with [News'] alleged disparagement conduct, and the record does not indicate that there were any other factors that would have been associated with such significant losses.

(Overstreet Rep. at 118 n.157.) This is a strange statement, since it seems clear that it is at least **possible** that a poor earnings report could cause a drop in stock price. Overstreet's comments lend credence to News' argument that he did not account for other factors in his analysis. However, Overstreet's determination that there were no

"other factors that could have been associated with such significant losses" is within his purview as an expert to determine. Although he could have taken a poor quarterly report into consideration, the Court does not find he was required to do so in order to make his testimony admissible.

Ultimately, News' arguments are directed at issues that go to weight, not admissibility. Though Overstreet may not have accounted for various factors News found important, the wisdom of such decisions is best challenged on cross-examination.

The Court finds Overstreet's damages models based on his use of comparable companies in terms of market capitalization, and his additional comparisons of Insignia with "advertising" companies that showed no significant disparity with the original set of comparables, reliable and likely to be helpful to a jury.

## 2. Projections by Insignia Employees

News challenges Overstreet's damages model finding harm of more than $125 million with regard to Insignia's primary product, POPSign.[4] Overstreet's report states that at his request, Insignia management personnel used their best business judgment to estimate what they think they would have been able to achieve from POPSign in the years from 2003 onward had News not committed its alleged acts. (Overstreet Rep. at 119.) Overstreet "vetted the model, examining the various assumptions made, and [he] concluded that the model was a reasonable projection of Insignia prospects in a market

---

[4] News cites "$200 million" as the damages Overstreet finds due to his projections model. However, Overstreet's report suggests that he found damages equal to $125.293 million. (Overstreet Rep. at 120.)

free of exclusionary behavior." (*Id.*) The financial projections were compiled by representatives from multiple departments at Insignia, including operations, marketing, sales, and accounting. (Simcox Dep. 12:14:20, Apr. 19, 2010, Istrail Decl. Ex. 12, Docket No. 661.) Scott Simcox, Senior Vice President of Marketing Services for Insignia, testified that to arrive at the projections Insignia employed its usual budgeting process to estimate revenues and costs, thus the projections were similar to the budgets Insignia prepares annually. (Simcox Dep. 46:1-47:25.)

News alleges that the POPSign damages are based on no expert methodology, because the people creating the projections had an incentive to skew the numbers towards larger lost-profits, and because the projections were based on a hypothetical situation with no evidentiary support. News is particularly critical that the projections suggest an exponential increase in revenue, five times Insignia's greatest previous increase. (Murphy Supplemental Rep. Ex. 9, Ettinger Decl. Ex. A.)

Also, in September 2002, an institutional research and investment banking firm said:

> [Recent distribution agreements] give us confidence that Insignia can grow at a 40-50% annual rate for at least the next three years . . . In our opinion, Insignia is in the beginning stages of a significant multi-year revenue and earnings ramp . . . .

(Craig-Hallum Report at 1, Istrail Decl. Ex. 14.) A presentation prepared by Insignia in November 2002 to inform investors about its business model and products projected $37 million in POPS revenue for 2003, and $54 million in 2004. (POPS Presentation at IS07-

442724, Istrail Decl. Ex. 16.)    In December 2002, Insignia prepared a budget for 2003 projecting revenues of $39.7 million.  (Istrail Decl. Ex. 13.)

Overstreet testified that he could not verify various aspects of Insignia's projections although he relied on them.  (Overstreet Dep. 619:4-620:3, 629:7-630:14.) Further, Overstreet stated in relation to the "March model" (projections and other business information produced by Insignia) that "the calculation in that model [is] basically one version of the but-for world that was produced by Insignia management. And you can see from my analysis I've not adopted it in toto at all . . . I'm not as comfortable with that as I am of the results of the analysis that I've done here." (Overstreet Dep. 617:3-11.)

News also argues that the disparagement damages were contrary to admitted facts, because Simcox "admitted that there were less than three examples of alleged disparagement by [News] in each of 2007-9."  (Mot. to Exclude Overstreet at 22.)  News argues that the effect of the disparagement should have declined over time, but that Simcox testified that the projections made no assumptions about how long the effects of the disparagement lasted, further demonstrating the unreliability of the underlying facts of Overstreet's damages model based on Insignia's projections.

Overall, News objects to Insignia's reliance on its "judgment and experience" to create the projections Overstreet relied on for his analysis.  This argument goes to weight, not admissibility, as the underlying facts on which Overstreet relied can be challenged on cross-examination, and should not be a basis for exclusion.  Further, Overstreet appears to have relied on projections from the best business judgment of Insignia employees, and

any bias in such figures can be inquired about on cross-examination. The independence of Overstreet's conclusion is supported by his reluctance to certify **all** of Insignia's calculations and his statement that he "vetted the model, examining the various assumptions made, and [he] concluded that the model was a reasonable projection of Insignia prospects in a market free of exclusionary behavior." (Overstreet Rep. at 119.) Finally, evidence in the record suggests that Insignia (and investors) expected its profitability to increase rapidly from 2003 on, so the proper question, again for cross-examination, is whether Overstreet's figures were in line with such predictions. Taking the projections and Overstreet's work as a whole, the Court is satisfied that he was working from reliable facts to reach a justifiable damages assessment.

### 3.     Additional Products

Overstreet also estimates the but-for sales of three new products in Insignia's product line ("additional products") other than POPSign. In his report, he "recognize[d] that Insignia would not be able to capture all sales at a given price. Thus [he] accounted for competition from other rivals by assuming that Insignia [would] win only 20% of the available sales at any given price." (Overstreet Updated Damages Rep. ¶ 20, Ettinger Decl. Ex. D.) Overstreet tested the sensitivity of his results by considering the impact on damages of a range of win rates that were consistent with but-for markets in which there were 5, 4, and 3 equally sized rivals. Overstreet's analysis for the additional products uses the level of predicted sales of Insignia's POPSigns for 2003-2007 in two different models of damages, accounting for both high and lower levels of predicted sales. (*Id.*

¶ 17.)  He considered the win rates "appropriate for the purposes of this analysis."  (*Id.* at 8 n.31.)  Overstreet conducted his own projections as to how he believed the additional products would have performed in the but-for world, and apparently relied, to some limited extent, on revenue projections from Insignia.   (Overstreet Dep. 688:16-20) ("Q: [Y]ou did your own calculations for but-for revenue projections for those three additional products, correct?  A:  I did, yes.").

News argues that Overstreet's analysis determining that Insignia suffered more than $20 million in damages with regard to Shelf Pop, Pop Select Coupon, and Pop Select Tear pad, is unreliable because sales of those products have been negligible.  It is unreliable, News asserts, because Overstreet did not read any documents about them, physically interact with them, and was not sure if he had seen pictures of them. (Overstreet Dep. 689:18-690:8.)   Further, Overstreet testified that he was unable to compare the features and characteristics of the additional products with those of News' products.  (*Id.* 700:11-703:14.)  Thus, News argues that "Overstreet reached sweeping – and arbitrary – conclusions."  (Mot. to Exclude Overstreet at 28.)

Given the extensive analysis Overstreet conducted regarding the additional products, the fact that he did not look at or physically interact with the additional products is at most minimally relevant.  (*See* Overstreet Updated Damages Report ¶¶ 13-25.)  Insignia has argued that News effectively closed out competitors from the in-store advertising market, and has also argued that Insignia, even when faced with anticompetitive conduct, is able to successfully compete to some extent.  Thus, a 20% share of a new product market, minus anticompetitive conduct such as exclusive

contracts and disparagement, is not unreasonable given Overstreet's calculations. Overstreet's analysis of the likely damages from that conduct is based on reliable methods and facts, and he has adequately considered relevant variables in estimating damages from News' alleged anticompetitive conduct regarding the additional products.

### 4. Failure to Account for Market Realities and Other "Inconvenient" Evidence

News argues that Overstreet's damage estimates for POPSign and additional products are flawed because, in addition to the flaws in the models discussed above, they also fail to take into account various "economic realities" and other "inconvenient evidence" that should have been factored into any calculations. Specifically, News identifies three such categories: (a) demand for price signs; (b) effect of allegedly increasing competition; and (c) the presence of exclusive vendors in the but-for world. (Mot. to Exclude Overstreet at 30-32.)

Essentially, News is arguing with how Overstreet did his analysis, and what factors he should have considered. Though News' arguments are relevant, they address issues that go to the weight, not admissibility, of Overstreet's testimony. Examination of any of the above categories would suggest only the thoroughness and wisdom of including or excluding various types of market variables.

### 5. Allocation of Damages

News argues that "many courts" require a damage estimate to calculate damages separately with regard to each violation alleged, and that Overstreet's damages model has

not met this requirement.  News relies on *ILC Peripherals Leasing Corp. v. International Business Machines Corp.*, 458 F. Supp. 423, 434 (N.D. Cal. 1978), and *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 708 F.2d 1081, 1161-62 (7th Cir. 1983) to support this proposition.  Specifically, News would require that Overstreet independently evaluate what the separate effect of each violation was."  *ILC Peripherals Leasing Corp.*, 458  F. Supp. at 434.  However, the *ILC Peripherals* court was discussing disaggregating damages when some acts are found to be unlawful and some are not.  *Id.*  ("Thus, if one of IBM's acts was not a violation of the antitrust laws, much of the damage claim would become invalid.").  The Eighth Circuit offers a more tailored rule for the situation here, stating that:

> An antitrust plaintiff's damage claim is not, as the appellees suggest, rendered speculative or unreasonable merely because it fails to provide for a specific reduction in the event that allegations of certain unlawful conduct are rejected. In other words, if an antitrust plaintiff alleges that the defendant engaged in unlawful acts A, B, C, and D, and acts C and D are later rejected as a basis of liability, it does not automatically follow that the damage award must be reduced. Rather, if acts A and B support the entire damage award, it must be sustained.

*Nat'l Farmers' Org., Inc.*, 850 F.2d at 1307.  News argues that this statement actually means that separate damages estimates are required **except** for claims which could support the entire damages award.  Thus, because there were separate effects for disparagement, and exclusive contracts, an overall damages estimate fails to properly apportion damages between the two harms.  *Id.*

In any event, Overstreet did provide a way to disaggregate damages attributable to exclusionary conduct from those attributable to disparagement.  He first notes that "[t]he

damages attributable to exclusive contracts are not estimated separately from the damages attributable to other aspects of [News'] conduct." (Overstreet Rebuttal Rep. at 35.) However,

> the total estimated damages from the financial model can be divided in a variety of ways. One division is between damages due to Insignia's reduced ability to make sales given its retailer network and CPG customers (in 2003) and damages due to Insignia's reduced ability to expand its retailer network beyond these retailers and CPGs. Assuming that [News'] disparagement conduct primarily affected Insignia's ability to sell its products . . . this division within the financial model is a reasonable basis for disaggregating the total damages . . . This basis for disaggregating damages could be used to disaggregate any of the damages estimates I provided in my prior report.

(*Id.* at 35.) Essentially, Overstreet laid out a method for disaggregating damages attributable to exclusionary conduct from damages attributable to disparagement. Though News may still object to Overstreet's methodology for disaggregation, such concerns are best addressed through cross-examination.

### 6.    Failure to Exclude Damages from Released Claims

News additionally seeks to exclude Overstreet's report because "in the Insignia but-for world . . . any exclusive contracts that existed as of January 1, 2003, would be void, including contracts that were entered into prior to that date . . . . [thus exclusivity] damages would be traceable to released exclusive contracts," which are barred by the Settlement Agreement. (Mot. to Exclude Overstreet at 35.) News further argues that there is no way to distinguish any of the damages barred by the settlement from those that are not (i.e. disparagement damages) because Overstreet failed to disaggregate the damages for the exclusivity and disparagement claims.

As discussed above, Overstreet has provided a way to disaggregate damages, though he admits it is an imperfect method. Further, Insignia appears to acknowledge that it cannot seek damages related to exclusive agreements between retailers and News signed prior to the release. Thus, the Court finds that Overstreet did not improperly fail to exclude damages from released claims, but may be required to explain how he arrived at his damages estimates without taking into account released conduct.

### 7. Overstreet's Opinion on Relevant Product Market and Exclusive Contracts

News argues that Overstreet's opinions on the relevant market and exclusive contracts fail to distinguish between lawful and unlawful conduct, and are not based on "hard evidence." Further, News argues that Overstreet's analysis of claims relating to exclusive contracts failed to distinguish between lawful and unlawful behavior, and lacked critical facts and data. News argues that three elements must be present before exclusive contracts can be judged unlawful: (1) they must foreclose competition; (2) the foreclosure must harm overall competition in the relevant market; and (3) the foreclosure must result from anticompetitive behavior, not competition itself. *Jefferson Parish Hosp. Dist. No. 2. v. Hyde*, 466 U.S. 2, 45 (1984); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1231 (8th Cir. 1987). News asserts that Overstreet's opinions on exclusive contracts do not address the facts relevant to those legal requirements.

Challenges to the factual basis of an expert's opinion go to weight, not admissibility. Here, News has largely challenged which facts and circumstances Overstreet evaluated to reach his conclusions. Though Overstreet could have perhaps

been more thorough in some of his explanations, such issues are appropriate for cross-examination, not a basis for exclusion.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     News America Marketing In-Store, Inc.'s Motion *In Limine* to Exclude the Opinions and Expert Testimony of Paula E. Payton and Steve Frenda [Docket No. 649] is **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.     The motion is **DENIED** as to Payton's testimony on her experience with CPGs and her opinion on anticipated reactions to disparaging or negative communications;

    b.     The motion is **GRANTED** in all other respects.

2.     News America Marketing In-Store, Inc.'s Motion *In Limine* to Exclude the Opinions and Expert Testimony of Dr. Thomas R. Overstreet, Jr. [Docket No. 654] is **DENIED.**

DATED:  January 14, 2011                                    ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                                           JOHN R. TUNHEIM
                                                                                    United States District Judge